No. 74–1445. BYNUM ET. AL. *v.* UNITED STATES; and
No. 74–6411. BIRNBAUM *v.* UNITED STATES. C. A.
2d Cir. Certiorari denied. Reported below: 513 F. 2d
533.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUG-
LAS and MR. JUSTICE MARSHALL concur, dissenting.

The "minimization" provision of Title III of the
Omnibus Crime Control and Safe Streets Act of 1968
provides that every order and extension thereof author-
izing electronic surveillance shall "contain a provision
that the authorization to intercept shall be . . . conducted
in such a way as to minimize the interception of com-
munications not otherwise subject to interception under
this chapter . . . ." 18 U. S. C. § 2518 (5). This "mini-
mization" provision, together with other safeguards, *e. g.,*
§§ 2518 (3)(a), (b), (c), and (d), constitutes the congres-
sionally designed bulwark against conduct of authorized
electronic surveillance in a manner that violates the con-
stitutional guidelines announced in *Berger* v. *New York,*
388 U. S. 41 (1967), and *Katz* v. *United States,* 389 U. S.
347 (1967). Congress has explicitly informed us that
the "minimization" and companion safeguards were de-
signed to assure that "the order will link up specific per-
son, specific offense, and specific place. Together [the
provisions of Title III] are intended to meet the test of
the Constitution that electronic surveillance techniques
be used only under the most precise and discriminate cir-
cumstances, which fully comply with the requirement of
particularity." S. Rep. No. 1097, 90th Cong., 2d Sess.,
102 (1968). These cases afford the Court a particularly
appropriate vehicle for fashioning principles to guide
authorizing judges in administering the "minimization"

provision—guidance which is absolutely essential if the congressional mandate to confine execution of authorized surveillances within constitutional and statutory bounds is to be carried out.

The urgent need for guidance from this Court clearly emerges from the record in these cases. For the record fairly bristles with apparent instances of indiscriminate and unwarranted invasions of privacy of nontargets of the surveillance.

Two telephones at the home of a friend of petitioner Bynum were the subjects of surveillance orders. The orders authorized federal narcotics agents to overhear and electronically record incoming and outgoing conversations of "Bynum and others as yet unknown." The order as extended for one telephone was for a period of 34 days, and the order for the second telephone covered the last 20 days of that period. The judge who authorized the surveillance left administration of the "minimization" provision to the monitoring agents, being of the view that the facts of the massive narcotics conspiracy under investigation precluded *per se* surveillance guidelines promulgated by him and that minimization would be better achieved by allowing the agents discretion in determining what should be intercepted. But the monitoring agents were not informed by the judge or their superiors of this decision. Rather, Mr. Updike, the Assistant United States Attorney who supervised the surveillance, testified that the agents were instructed to intercept all but privileged attorney-client communications:

> "And with respect to the actual operation of the intercept, my instructions were that they were to record everything except what any inspector felt was a privileged communication, and as to those they were to report to me when anything of that nature occurred or felt something of that nature occurred.

"But the instructions were that they were to record and to monitor at the start all communications that came over the telephone."

Moreover, the monitoring agents testified that they were unaware of, and had not been informed of, the statutory "minimization" provision. And although Mr. Updike testified that the monitoring agents did have discretion with regard to whether they should monitor a particular conversation (although not with regard to whether they should record it), he conceded that the agents were never informed that they had such discretion; when questioned whether he was "counting on the agents being bored and taking off their earphones as a vehicle by which the minimization objective of the statute would at least in part be accomplished," Mr. Updike responded: "I think that is a fair characterization."

In consequence of this failure in even the slightest respect to comply with the minimization safeguards, every conversation and attempted communication (whether incoming or outgoing) over the target telephones during the period was recorded, and approximately 90% of the completed communications were also contemporaneously monitored by the agents. The Government intercepted 1,974 completed communications, excluding calls to such services as information and the weather, which covered 102 hours of conversation time. Necessarily, calls of short duration will generally have to be monitored *in toto;* agents must inevitably listen briefly to all calls in order to determine the parties to and the nature of the conversation. But 501 conversations lasted at least three minutes, and 71 of these longer calls were made by Bynum's child's teenage babysitter Donna, who was totally innocent of any knowledge of her employer's criminal enterprise; her conversations were therefore "communications not . . . subject to

interception . . . ." The other party in each of these conversations, which accounted for 14½ hours of the intercepted conversations, was not a member of the narcotics conspiracy, and the conversations, which were sometimes the subject of jokes by the monitoring agents, were often of a highly personal and intimate nature. Although Mr. Updike was apprised of the nature of these calls during the course of the surveillance, he nevertheless ordered that Donna's calls be intercepted because they could be "useful" for such matters as determining where actual members of the conspiracy were and thus assist the visual surveillance aspect of the investigation. Of course, since Donna's conversations would not themselves have satisfied the particularity standard of Title III and would not, therefore, have independently been the proper subject of electronic surveillance, they clearly fall within the category whose interception Congress intended to be minimized under § 2518 (5).

Similarly, there were 47 calls of at least 10 minutes duration between petitioner Garnett, who resided at the address of the target telephones and in whose name they were listed, and personal friends who were not members of the conspiracy. Although Garnett was a "known" member of the conspiracy, whose calls might be subject to a lengthier initial surveillance period before their innocent nature was established, these personal calls of considerable length accounted for 19 hours of intercepted communications.

Also intercepted were a substantial number of calls involving attorneys, thus implicating both the attorney-client privilege and Sixth Amendment considerations. The judge had been informed that the surveillance might eventuate in the interception of such communications, particularly since some attorneys were suspected of involvement in the conspiracy. However, the judge ex-

plicitly directed that privileged communications should not be monitored, and he assumed that the interception of such calls would be reported to him. Nevertheless, the judge was told, contrary to the fact, in each interim report on the conduct of the surveillance that no privileged communications had been intercepted; indeed, although 67 telephone conversations involving attorneys were intercepted, 42 of which at least arguably fell within the attorney-client privilege and most of which were recognizable as involving attorneys, the judge was never called upon to decide whether any particular conversation was privileged. Moreover, although Mr. Updike had informed the monitoring agents generally that "privileged communications" of attorneys were not to be intercepted, he never instructed the monitoring agents, who were not themselves attorneys, what type of attorney-client communications would fall within the scope of the privilege.

Also significant, particularly in light of the companion statutory directive that surveillance must terminate as soon as its directives are accomplished, see § 2518 (5), is the fact that Mr. Updike and the monitoring agents were not informed of other developments in the investigation, such as the results of visual surveillance conducted on the suspects or the information supplied by informants. Mr. Updike did not receive the wiretap log entries of the monitoring agents on a daily basis, and he did not scrutinize the logs to evaluate the actual evidentiary value of the information derived from the surveillance. Moreover, although written reports were periodically submitted to the judge during the surveillance period, and although the wiretap log entries were attached to these reports, the reports themselves were conclusory statistical summaries concerning the intercepted communications, and actually revealed that a substantial

percentage of the overheard conversations were not narcotics related.

Eight conversations derived from this surveillance were introduced at petitioners' trial over timely objection, and numerous other conversations may have resulted in the acquisition of other evidence. The "minimization" issue thus has a substantial impact on the rights of these litigants. But it has a significantly broader impact. These cases thus present important questions, and in light of the extensive record upon which to predicate review, afford a particularly appropriate opportunity to delineate standards and procedures to guide law enforcement officials and supervising judges in implementing the minimization strictures of § 2518 (5). More specifically, the cases would permit us to address the following important issues:

(1) Is the mechanical recording of a conversation not actually overheard, an "interception" within 18 U. S. C. § 2510 (4)? The District Court held that conversations recorded but not overheard were not "intercepted." This holding substantially influenced the court's determination that the "minimization" provision had not been violated. The Court of Appeals declined to address the question, holding that the difference between what was only recorded and what was recorded and overheard was both *de minimis* and not measurable on the record.

(2) Was this round-the-clock surveillance conducted in a manner consistent with § 2518 (5), construing that section, as we must, in light of the proscription of general warrants by the Fourth Amendment? The answer to that question necessarily requires that we first specify what standards and procedures govern the determination whether minimization mandated by the section was effected.

(3) What constitutes adequate judicial oversight of

the surveillance to effect minimization? Must the judge keep records of all contacts between the judge and the monitoring agents? Must patterns of innocent or privileged calls be brought to the judge's attention so that he can make an informed contemporaneous determination of the relative evidentiary value of the surveillance compared with the invasion of privacy which it entails? Must the names of suspected co-conspirators be brought to the judge's attention so he can order varying initial surveillance periods in which the agents should determine whether a call is licit or illicit, with only spot monitoring thereafter to ensure that the parties to or the nature of the call have not changed? Must any surveillance directives of the supervising judge be conveyed to the actual monitoring agents, and can a *post hoc* analysis that intercepted conversations were illicit excuse a failure to make an actual minimization effort? Must the judge be informed not only of the conduct of the surveillance, but of the conduct of other aspects of the investigation of which it is but a part, so that the surveillance may be terminated as soon as its objectives are achieved or the wiretap becomes otherwise superfluous to the investigation?

(4) If the surveillance in these cases did not comply with the "minimization" requirement, what is the appropriate remedy? In particular, should suppression be limited to conversations which should not themselves have been intercepted, or should all conversations derived from a surveillance not conducted so as to minimize improper interception be suppressed?

These questions, in the context of a conspiracy investigation conducted through electronic surveillance, are substantial federal issues that merit our plenary review. Such problems are likely to be recurring, and we plainly fail in our judicial responsibility when we do not review

these cases to give content to the congressional mandate of "minimization."

I would therefore grant the petitions limited to the questions presented respecting the "minimization" provision, § 2518 (5), and set the cases for oral argument.