SCOTT ET AL. *v.* UNITED STATES

No. 76-6767.   Argued March 1, 1978—Decided May 15, 1978

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, Powell, and Stevens, JJ., joined.

BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 143.

*John A. Shorter* argued the cause for petitioners. With him on the briefs were *Samuel Dash* and *Michael E. Geltner.*

*Richard A. Allen* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Civiletti,* and *Deputy Solicitor General Frey.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which deals with wiretapping and other forms of electronic surveillance. 18 U. S. C. §§ 2510–2520 (1976 ed.). In this Act Congress, after this Court's decisions in *Berger* v. *New York,* 388 U. S. 41 (1967), and *Katz* v. *United States,* 389 U. S. 347 (1967), set out to provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessarily infringing upon the right of individual privacy. See generally S. Rep. No. 1097, 90th Cong., 2d Sess. (1968). We have had occasion in the past, the most recent being just last Term, to consider exactly how the statute effectuates this balance.[1] This case requires us to construe the statutory requirement that wiretapping or electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." 18 U. S. C. §2518(5) (1976 ed.).

Pursuant to judicial authorization which required such minimization, Government agents intercepted all the phone conversations over a particular phone for a period of one

---

**Peter S. Smith* filed a brief for Chloe V. Daviage as *amicus curiae* urging reversal.

[1] See *United States* v. *Donovan,* 429 U. S. 413 (1977), which involved that part of the Act which requires the Government to identify the person, if known, whose conversations are to be intercepted.

month.   The District Court for the District of Columbia suppressed all intercepted conversations and evidence derived therefrom in essence because the "admitted knowing and purposeful failure by the monitoring agents to comply with the minimization order was unreasonable . . . even if every intercepted call were narcotic-related." App. 39. The Court of Appeals for the District of Columbia Circuit reversed, concluding that an assessment of the reasonableness of the efforts at minimization first requires an evaluation of the reasonableness of the actual interceptions in light of the purpose of the wiretap and the totality of the circumstances before any inquiry is made into the subjective intent of the agents conducting the surveillance.   170 U. S. App. D. C. 158, 516 F. 2d 751 (1975). We granted certiorari to consider this important question, 434 U. S. 888 (1977), and, finding ourselves in basic agreement with the Court of Appeals, affirm.

## I

In January 1970, Government officials applied, pursuant to Title III, for authorization to wiretap a telephone registered to Geneva Jenkins.[2]   The supporting affidavits alleged that there was probable cause to believe nine individuals, all named, were participating in a conspiracy to import and distribute narcotics in the Washington, D. C., area and that Geneva Jenkins' telephone had been used in furtherance of the conspiracy, particularly by petitioner Thurmon, who was then living with Jenkins.   The District Court granted the application on January 24, 1970, authorizing agents to "[i]ntercept the wire communications of Alphonso H. Lee, Bernis Lee Thurmon, and other persons as may make use of the facilities hereinbefore described." App. 80.   The order also required the agents to conduct the wiretap in "such a way as to mini-

---

[2] The application and subsequent court order identified the subscriber as Geneva Thornton, but that was apparently an alias.   331 F. Supp. 233, 236 (DC 1971).

mize the interception of communications that are [not] otherwise subject to interception" under the Act[3] and to report to the court every five days "the progress of the interception and the nature of the communication intercepted." *Ibid.* Interception began that same day and continued, pursuant to a judicially authorized extension, until February 24, 1970, with the agents making the periodic reports to the judge as required. Upon cessation of the interceptions, search and arrest warrants were executed which led to the arrest of 22 persons and the indictment of 14.

Before trial the defendants, including petitioners Scott and Thurmon, moved to suppress all the intercepted conversations on a variety of grounds. After comprehensive discovery and an extensive series of hearings, the District Court held that the agents had failed to comply with the minimization requirement contained in the wiretap order and ordered suppression of the intercepted conversations and all derivative evidence. The court relied in large part on the fact that virtually all the conversations were intercepted while only 40% of them were shown to be narcotics related. This, the court reasoned, "strongly indicate[d] the indiscriminate use of wire surveillance that was proscribed by *Katz*[4] and *Berger*."[5] 331 F. Supp. 233, 247 (DC 1971).

The Court of Appeals for the District of Columbia Circuit reversed and remanded, stating that the District Court should not have based its determination upon a general comparison of the number of narcotics-related calls with the total number of calls intercepted, but rather should have engaged in a particularized assessment of the reasonableness of the agents' attempts to minimize in light of the purpose of the wiretap and the information available to the agents at the time of

---

[3] The word "not" was inadvertently omitted, but the agents apparently understood the intent of the order. *Id.*, at 245 n. 1.

[4] *Katz* v. *United States,* 389 U. S. 347 (1967).

[5] *Berger* v. *New York,* 388 U. S. 41 (1967).

interception. 164 U. S. App. D. C. 125, 129, 504 F. 2d 194, 198 (1974).[6]

Upon remand, the District Court again ordered suppression, this time relying largely on the fact that the agents were aware of the minimization requirement, "but made no attempt to comply therewith." App. 37, 38.[7] "The admitted knowing

---

[6] The District Court also made a number of other related rulings which were affirmed on appeal. It upheld Title III against a claim that the statute contravened the Fourth Amendment restriction against unreasonable searches and seizures; determined that the application and affidavits were sufficient on their face to establish probable cause; and held that the order complied with the requirements of the statute. Petitioners have not sought review of any of these holdings. The Court of Appeals also held that Scott could introduce evidence based on conversations in which he did not participate to demonstrate that the intercepted conversations to which he was a party were not seized "in conformity with the order of authorization." 18 U. S. C. § 2518 (10) (a) (iii) (1976 ed.). See 164 U. S. App. D. C., at 127–128, 504 F. 2d, at 196–197.

[7] This conclusion was based on the fact that virtually all calls were intercepted and on the testimony of Special Agent Glennon Cooper, the agent in charge of the investigation, who testified that the only steps taken which actually resulted in the nonreception of a conversation were those taken when the agents discovered the wiretap had inadvertently been connected to an improper line. The court laid particular stress on the following exchange:

"BY THE COURT:

.      .      .      .      .

"Q. The question I wish to ask you is this, whether at any time during the course of the wiretap—of the intercept, what if any steps were taken by you or any agent under you to minimize the listening?

"A. Well, as I believe I mentioned before, I would have to say that the only effective steps taken by us to curtail the reception of conversations was in that instance where the line was connected to—misconnected from the correct line and connected to an improper line. We discontinued at that time.

"Q. Do I understand from you then that the only time that you considered minimization was when you found that you had been connected with a wrong number?

"A. That is correct, Your Honor." App. 179.

and purposeful failure by the monitoring agents to comply with the minimization order was unreasonable . . . even if every intercepted call were narcotic-related." *Id.,* at 39.

The Court of Appeals again reversed, holding that the District Court had yet to apply the correct standard. 170 U. S. App. D. C. 158, 516 F. 2d 751 (1975). The court recognized that the "presence or absence of a good faith attempt to minimize on the part of the agents is undoubtedly one factor to be considered in assessing whether the minimization requirement has been satisfied," but went on to hold that "the decision on the suppression motion must ultimately be based on the reasonableness of the actual interceptions and not on whether the agents subjectively intended to minimize their interceptions." *Id.,* at 163, 516 F. 2d, at 756. Then, because of the extended period of time which had elapsed since the commission of the offense in question, that court itself examined the intercepted conversations and held that suppression was not appropriate in this case because the court could not conclude that "some conversation was intercepted which clearly would not have been intercepted had reasonable attempts at minimization been made." *Id.,* at 164, 516 F. 2d, at 757.[8]

On the remand from the Court of Appeals, following a nonjury trial on stipulated evidence which consisted primarily of petitioners' intercepted conversations, Scott was found guilty of selling and purchasing narcotics not in the original stamped package, see 26 U. S. C. § 4704 (a) (1964 ed.), and Thurmon of conspiracy to sell narcotics, see 26 U. S. C. §§ 7237 (b) and 4705 (a) (1964 ed.).[9] The Court of Appeals affirmed

---

[8] The Court of Appeals, with four judges dissenting, denied rehearing and rehearing en banc, 173 U. S. App. D. C. 118, 522 F. 2d 1333 (1975), and we denied certiorari, 425 U. S. 917 (1976). MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE POWELL dissented from the denial of certiorari.

[9] The specific statutes under which petitioners were convicted were repealed in connection with the enactment of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1292.

the convictions, 179 U. S. App. D. C. 281, 551 F. 2d 467 (1977), and we granted certiorari. 434 U. S. 888 (1977).

## II

Petitioners' principal contention is that the failure to make good-faith efforts to comply with the minimization requirement is itself a violation of § 2518 (5). They urge that it is only after an assessment is made of the agents' good-faith efforts, and presumably a determination that the agents did make such efforts, that one turns to the question of whether those efforts were reasonable under the circumstances. See Reply Brief for Petitioner 4–5. Thus, argue petitioners, Agent Cooper's testimony, which is basically a concession that the Government made no efforts which resulted in the non-interception of any call, is dispositive of the matter. The so-called "call analysis," which was introduced by the Government to suggest the reasonableness of intercepting most of the calls, cannot lead to a contrary conclusion because, having been prepared after the fact by a Government attorney and using terminology and categories which were not indicative of the agents' thinking at the time of the interceptions, it does not reflect the perceptions and mental state of the agents who actually conducted the wiretap.

The Government responds that petitioners' argument fails to properly distinguish between what is necessary to establish a statutory or constitutional violation and what is necessary to support a suppression remedy once a violation has been established.[10] In view of the deterrent purposes of the exclu-

---

[10] The Government also argues that even if the agents in this case violated the minimization requirement by intercepting some conversations which could not have reasonably been intercepted, § 2518 (10) requires suppression of only those conversations which were illegally intercepted, not suppression of all the intercepted conversations. See, e. g., *United States* v. *Cox,* 462 F. 2d 1293, 1301–1302 (CA8 1972), cert. denied, 417 U. S. 918 (1974); *United States* v. *Sisca,* 361 F. Supp. 735, 746–747

sionary rule, consideration of official motives may play some part in determining whether application of the exclusionary rule is appropriate *after* a statutory or constitutional violation has been established. But the existence *vel non* of such a violation turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time. Subjective intent alone, the Government contends, does not make otherwise lawful conduct illegal or unconstitutional.[11]

(SDNY 1973), aff'd, 503 F. 2d 1337 (CA2), cert. denied, 419 U. S. 1008 (1974); *United States* v. *Mainello,* 345 F. Supp. 863, 874–877 (EDNY 1972); *United States* v. *LaGorga,* 336 F. Supp. 190 (WD Pa. 1971). It also renews its argument that petitioner Scott does not have standing to raise a minimization challenge based upon the interception of conversations to which he was not a party. To permit such a challenge would allow Scott to secure the suppression of evidence against him by showing that the rights of other parties were violated. This, argues the Government, would contravene well-settled principles of Fourth Amendment law, cf. *Brown* v. *United States,* 411 U. S. 223, 230 (1973); *Alderman* v. *United States,* 394 U. S. 165, 197 (1969); *Simmons* v. *United States,* 390 U. S. 377 (1968), which clearly apply to Title III cases, see S. Rep. No. 1097, 90th Cong., 2d Sess., 91, 106 (1968); *Alderman* v. *United States, supra,* at 175–176.

Given our disposition of this case we find it unnecessary to reach the Government's contention regarding the scope of the suppression remedy in the event of a violation of the minimization requirement. We also decline to address the Government's argument with respect to standing. The Government concedes that petitioner Thurmon was a party to some nonnarcotics-related calls and thus has standing to make the arguments advanced herein. Thus, even if we were to decide that Scott has no standing we would be compelled to undertake the decision of these issues. If, on the other hand, we were to decide that Scott does have standing, we would simply repeat exactly the same analysis made with respect to Thurmon's claim and find against Scott as well. In this circumstance we need not decide the questions of Scott's standing. See *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 44–45 (1974); *Doe* v. *Bolton,* 410 U. S. 179, 189 (1973).

[11] The Government also adds that even if subjective intent were the standard, the record does not support the District Court's conclusion that

We think the Government's position, which also served as the basis for decision in the Court of Appeals, embodies the proper approach for evaluating compliance with the minimization requirement. Although we have not examined this exact question at great length in any of our prior opinions, almost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him. The language of the Amendment itself proscribes only "unreasonable" searches and seizures. In *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968), the Court emphasized the objective aspect of the term "reasonable."

> "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (Footnotes omitted.)

See also *Beck* v. *Ohio*, 379 U. S. 89, 96–97 (1964); *Henry* v. *United States*, 361 U. S. 98, 102–103 (1959).

---

the agents subjectively intended to violate the statute or the Constitution. It contends that the failure to stop intercepting calls, the interception of which was entirely reasonable, does not support a finding that the agents would have intercepted calls that should not have been intercepted had they been confronted with that situation. We express no view on this matter.

We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. In *United States* v. *Robinson*, 414 U. S. 218 (1973), a suspect was searched incident to a lawful arrest. He challenged the search on the ground that the motivation for the search did not coincide with the legal justification for the search-incident-to-arrest exception. We rejected this argument: "Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed." *Id.*, at 236. The Courts of Appeals which have considered the matter have likewise generally followed these principles, first examining the challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved.[12]

Petitioners do not appear, however, to rest their argument entirely on Fourth Amendment principles. Rather, they argue in effect that regardless of the search-and-seizure analysis conducted under the Fourth Amendment, the statute regulating wiretaps requires the agents to make good-faith efforts at

---

[12] See, *e. g.*, *United States* v. *Bugarin-Casas*, 484 F. 2d 853, 854 n. 1 (CA9 1973), cert. denied, 414 U. S. 1136 (1974) ("The fact that the agents were intending at the time they stopped the car to search it in any event . . . does not render the search, supported by independent probable cause, invalid"); *Dodd* v. *Beto*, 435 F. 2d 868, 870 (CA5 1970), cert. denied, 404 U. S. 845 (1971); *Klingler* v. *United States*, 409 F. 2d 299, 304 (CA8), cert. denied, 396 U. S. 859 (1969); *Green* v. *United States*, 386 F. 2d 953, 956 (CA10 1967); *Sirimarco* v. *United States*, 315 F. 2d 699, 702 (CA10), cert. denied, 374 U. S. 807 (1963). As is our usual custom, we do not, in citing these or other cases, intend to approve any particular language or holding in them.

minimization, and the failure to make such efforts is itself a violation of the statute which requires suppression.

This argument fails for more than one reason. In the first place, in the very section in which it directs minimization Congress, by its use of the word "conducted," made it clear that the focus was to be on the agents' actions not their motives. Any lingering doubt is dispelled by the legislative history which, as we have recognized before in another context, declares that § 2515 was not intended "generally to press the scope of the suppression role beyond present search and seizure law." S. Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968). See *Alderman* v. *United States,* 394 U. S. 165, 175–176 (1969).[13]

## III

We turn now to the Court of Appeals' analysis of the reasonableness of the agents' conduct in intercepting all of the calls in this particular wiretap. Because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case.

---

[13] This is not to say, of course, that the question of motive plays absolutely no part in the suppression inquiry. On occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule. For example, in *United States* v. *Janis,* 428 U. S. 433, 458 (1976), we ruled that evidence unconstitutionally seized by state police could be introduced in federal civil tax proceedings because "the imposition of the exclusionary rule . . . is unlikely to provide significant, much less substantial, additional deterrence. It falls outside the offending officer's zone of primary interest." See also *United States* v. *Ceccolini,* 435 U. S. 268, 276–277 (1978). This focus on intent, however, becomes relevant only after it has been determined that the Constitution was in fact violated. We also have little doubt that as a practical matter the judge's assessment of the motives of the officers may occasionally influence his judgment regarding the credibility of the officers' claims with respect to what information was or was not available to them at the time of the incident in question. But the assessment and use of motive in this limited manner is irrelevant to our analysis of the questions at issue in this case.

The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

We agree with the Court of Appeals that blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

In determining whether the agents properly minimized, it is also important to consider the circumstances of the wiretap. For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptable because they will involve one or more of the co-conspirators. The type of use to which the telephone is normally put may also have some bearing on the extent of minimization required. For example, if the agents are permitted to tap a public telephone because one individual is thought to be placing bets over the phone, substantial doubts as to minimization may arise if the agents listen to every call which goes out over that phone regardless of who places the call. On the other hand, if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated.

Other factors may also play a significant part in a particular case. For example, it may be important to determine at exactly what point during the authorized period the interception was made. During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter. Interception of those same types of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type. Other situations may arise where patterns of nonpertinent calls do not appear. In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed.

After consideration of the minimization claim in this case in the light of these observations, we find nothing to persuade us that the Court of Appeals was wrong in its rejection of that claim.[14] Forty percent of the calls were clearly narcotics related and the propriety of their interception is, of course, not in dispute. Many of the remaining calls were very short, such as wrong-number calls, calls to persons who were not available to come to the phone, and calls to the telephone company to

---

[14] Petitioners argue that the "district court found that the call analysis contained errors of characterization and factual inaccuracies and did not represent information known to the agents at the time of interception." Brief for Petitioners 25–26. We do not think petitioners have fairly characterized the District Court's findings, however. The District Court found: "The 'call analysis' conflicts with the reports and characterizations of the intercepted calls as made and determined by the monitoring agents whose conduct is controlling in this case." App. 38. This does not suggest that the call analysis was factually erroneous, but rather that the categories used by the attorney who prepared the analysis were not necessarily of the same sort employed by the monitoring agents. This finding would thus have relevance if the critical inquiry focused on the subjective intent of the agents, but it certainly cannot be read as a finding that the general analysis of the calls set forth in the call analysis contains "factual inaccuracies."

hear the recorded weather message which lasts less than 90 seconds. In a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed.[15] A large number were ambiguous in nature, making characterization virtually impossible until the completion of these calls. And some of the nonpertinent conversations were one-time conversations. Since these calls did not give the agents an opportunity to develop a category of innocent calls which should not have been intercepted, their interception cannot be viewed as a violation of the minimization requirement.

We are thus left with the seven calls between Jenkins and her mother. The first four calls were intercepted over a three-day period at the very beginning of the surveillance. They were of relatively short length and at least two of them indicated that the mother may have known of the conspiracy. The next two calls, which occurred about a week later, both contained statements from the mother to the effect that she had something to tell Jenkins regarding the "business" but did not want to do so over the phone. The final call was substantially longer and likewise contained a statement which could have been interpreted as having some bearing on the conspiracy, *i. e.*, that one "Reds," a suspect in the conspiracy,

---

[15] Petitioners intimate that the scope of the investigation was narrower than originally anticipated because the intercepts revealed only local purchases within the Washington area. That certainly has no bearing on what the officers had reasonable cause to believe at the time they made the interceptions, however. And while it is true that the conspiracy turned out to involve mainly local distribution, rather than major interstate and international importation, it is not at all clear that the information garnered through the wiretap reduced the agents' estimates of the number of people involved or the extent of the drug traffic. In short, there is little doubt on the record that, as the agents originally thought, the conspiracy can fairly be characterized as extensive.

had called to ask for a telephone number. Although none of these conversations turned out to be material to the investigation at hand, we cannot say that the Court of Appeals was incorrect in concluding that the agents did not act unreasonably at the time they made these interceptions. Its judgment is accordingly

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

In 1968, Congress departed from the longstanding national policy forbidding surreptitious interception of wire communications,[1] by enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520 (1976 ed.). That Act, for the first time authorizing law enforcement personnel to monitor private telephone conversations, provided strict guidelines and limitations on the use of wiretaps as a barrier to Government infringement of individual privacy. One of the protections thought essential by Congress as a bulwark against unconstitutional governmental intrusion on private conversations is the "minimization requirement" of § 2518 (5). The Court today eviscerates this congressionally mandated protection of individual privacy, marking the third decision in which the Court has disregarded or diluted congressionally established safeguards [2] designed to prevent Government electronic surveillance from becoming the abhorred

---

[1] Prior to the enactment of Title III, § 605 of the Communications Act of 1934, ch. 652, 48 Stat. 1064, 1104, provided that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . . ."

[2] See *United States* v. *Donovan*, 429 U. S. 413, 445 (1977) (MARSHALL, J., dissenting in part); *United States* v. *Kahn*, 415 U. S. 143, 158 (1974) (Douglas, J., dissenting); see also *United States* v. *Chavez*, 416 U. S. 562, 580 (1974) (opinion of Douglas, J.).

general warrant which historically had destroyed the cherished expectation of privacy in the home.[3]

The "minimization provision" of § 2518 (5) provides, *inter alia,* that every order authorizing interception of wire communications include a requirement that the interception *"shall be conducted* in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." (Emphasis added.) The District Court's findings of fact, not challenged here or in the Court of Appeals, plainly establish that this requirement was shamelessly violated. The District Court found:

> "[T]he monitoring agents made no attempt to comply with the minimization order of the Court but listened to and recorded all calls over the [subject] telephone. They showed no regard for the right of privacy and did nothing to avoid unnecessary intrusion." App. 36.

The District Court further found that the special agent who conducted the wiretap testified under oath that "he and the agents working under him knew of the minimization requirement but made no attempt to comply therewith." *Id.,* at 37. The District Court found a "knowing and purposeful failure" to comply with the minimization requirements. *Id.,* at 39. These findings, made on remand after re-examination, reiterated the District Court's initial finding that "[the agents] did not even attempt 'lip service compliance' with the provision of the order and statutory mandate but rather completely disregarded it." 331 F. Supp. 233, 247 (DC 1971). In the face of this clear finding that the agents monitored every call and, moreover, knowingly failed to conduct the wiretap "in such a way as to minimize the interception of communications" not subject to interception, and despite the fact that 60% of all calls intercepted were not subject to intercep-

---

[3] See *United States* v. *Kahn, supra,* at 160–162, and nn. 3–4 (Douglas, J., dissenting).

tion, the Court holds that no violation of § 2518 (5) occurred. The basis for that conclusion is a *post hoc* reconstruction offered by the Government of what would have been reasonable assumptions on the part of the agents had they attempted to comply with the statute. Since, on the basis of this reconstruction of reality, it would have been reasonable for the agents to assume that each of the calls dialed and received was likely to be in connection with the criminal enterprise, there was no violation, notwithstanding the fact that the agents intercepted every call with no effort to minimize interception of the noninterceptable calls. That reasoning is thrice flawed.

First, and perhaps most significant, it totally disregards the explicit congressional command that the wiretap be *conducted* so as to minimize interception of communications not subject to interception. Second, it blinks reality by accepting, as a substitute for the good-faith exercise of judgment as to which calls should not be intercepted by the agent most familiar with the investigation, the *post hoc* conjectures of the Government as to how the agent would have acted had he exercised his judgment. Because it is difficult to know with any degree of certainty whether a given communication is subject to interception prior to its interception, there necessarily must be a margin of error permitted. But we do not enforce the basic premise of the Act that intrusions of privacy must be kept to the minimum by excusing the failure of the agent to make the good-faith effort to minimize which Congress mandated. In the nature of things it is impossible to know how many fewer interceptions would have occurred had a good-faith judgment been exercised, and it is therefore totally unacceptable to permit the failure to exercise the congressionally imposed duty to be excused by the difficulty in predicting what might have occurred had the duty been exercised. Finally, the Court's holding permits Government agents deliberately to flout the duty imposed upon them by Congress. In a linguistic *tour*

*de force* the Court converts the mandatory language that the interception "shall be conducted" to a precatory suggestion. Nor can the Court justify its disregard of the statute's language by any demonstration that it is necessary to do so to effectuate Congress' purpose as expressed in the legislative history. On the contrary, had the Court been faithful to the congressional purpose, it would have discovered in § 2518 (10) (a) and its legislative history the unambiguous congressional purpose to have enforced the several limitations on interception imposed by the statute. Section 2518 (10)(a) requires suppression of evidence intercepted in violation of the statute's limitations on interception, and the legislative history emphasizes Congress' intent that the exclusionary remedy serve as a deterrent against the violation of those limitations by law enforcement personnel. See S. Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968).

The Court's attempted obfuscation in Part II, *ante,* at 135–139, of its total disregard of the statutory mandate[4] is a transparent failure. None of the cases discussed there deciding the reasonableness under the Fourth Amendment of searches and seizures deals with the discrete problems of wire interceptions or addresses the construction of the minimization requirement of § 2518 (5). Congress provided the answer to that problem, and the wording of its command, and not general Fourth Amendment principles, must be the guide to our decision. The Court offers no explanation for its failure to heed the aphorism: "Though we may not end with the words in construing a disputed statute, one certainly begins there." Frankfurter,

---

[4] Although the Court's refusal to recognize as violative of § 2518 (5) a wiretap conducted in bad faith without regard to minimization necessarily will result in many invasions of privacy which otherwise would not occur, the objective requirement of "reasonableness" left unimpaired by the Court will clearly require suppression of interceptions in other circumstances. See, *e. g., Bynum* v. *United States,* 423 U. S. 952 (1975) (BRENNAN, J., dissenting from denial of certiorari).

Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 535 (1947).[5]

Moreover, today's decision does not take even a sidelong glance at *United States* v. *Kahn,* 415 U. S. 143 (1974), whose reasoning it undercuts, and which may now require overruling. Answering the question in *Kahn* of who must be named in an application and order authorizing electronic surveillance, the Court held:

> "Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought." *Id.,* at 155.

To support that holding against the argument that it would, in effect, approve a general warrant proscribed by Title III and the Fourth Amendment, see *id.,* at 158–163 (Douglas, J., dissenting), the Court relied on the minimization requirement as an adequate safeguard to prevent such unlimited invasions of personal privacy:

> "[I]n accord with the statute the order required the agents to execute the warrant in such a manner as to minimize the interception of any innocent conversations. . . . Thus, the failure of the order to specify that Mrs. Kahn's conversations might be the subject of interception hardly left the executing agents free to seize at will every communication that came over the wire—and there is no indication that such abuses took place in this case." *Id.,* at 154–155.   (Footnotes omitted.)

Beyond the inconsistency of today's decision with the reasoning of *Kahn,* the Court manifests a disconcerting willingness to unravel individual threads of statutory protection without

---

[5] Accord, *United States* v. *Kahn,* 415 U. S., at 151 ("[T]he starting point, as in all statutory construction, is the precise wording chosen by Congress in enacting Title III").

regard to their interdependence and to whether the cumulative effect is to rend·the fabric of Title III's "congressionally designed bulwark against conduct of authorized electronic surveillance in a manner that violates the constitutional guidelines announced in *Berger* v. *New York,* 388 U. S. 41 (1967), and *Katz* v. *United States,* 389 U. S. 347 (1967)," *Bynum* v. *United States,* 423 U. S. 952 (1975) (BRENNAN, J., dissenting from denial of certiorari). This process of myopic, incremental denigration of Title III's safeguards raises the specter that, as judicially "enforced," Title III may be vulnerable to constitutional attack for violation of Fourth Amendment standards, thus defeating the careful effort Congress made to avert that result.