UNITED STATES of America, Plaintiff,

v.

Walter Leroy MOODY, Jr., Defendant.

No. 1:90–CR–383.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 16, 1991.

See also, 762 F.Supp. 1485.

Louis J. Freeh and Howard M. Shapiro, Sp. Asst. U.S. Attys., N.D. Georgia, for U.S.

Edward D. Tolley, Cook, Noell, Tolley & Aldridge, Athens, Ga., and Donald F. Samuel, Garland & Samuel, Atlanta, Ga., for defendant.

## ORDER

DEVITT, District Judge, Sitting by Designation, Northern District of Georgia.

### Introduction

Defendant Walter Leroy Moody, Jr., charged in a 72–count superseding indictment with, *inter alia,* the December, 1989 mail-bombing assassinations of Eleventh Circuit United States Court of Appeals Judge Robert S. Vance and Savannah alderman and civil rights lawyer Robert E. Robinson, makes various pretrial motions. All told, defendant has submitted thirty motions for the court's consideration.

Many of defendant's motions have been resolved by agreement of the parties.[1] However, motions seeking the suppression of certain evidence obtained by the government through search and electronic surveillance remain in dispute. On April 9, 1991, the court heard testimony and argument relative to the disputed motions and the parties have briefed thoroughly these issues. For the reasons set forth below, the court denies defendant's pretrial suppression and severance motions.

## Background

The court summarizes briefly the history of this case. On December 16, 1989, Judge Robert S. Vance of the Eleventh Circuit United States Court of Appeals was assassinated after opening a package containing a pipe bomb. The package, addressed to Judge Vance, had been delivered to his residence in Mountain Brook, Alabama through the United States mails. Judge Vance's wife, Helen Rainey Vance, was seriously injured as a result of the explosion. Investigators eventually determined that the pipe bomb consisted of a steel pipe approximately five and one-half inches in length and one and one-half inches in diameter, sealed at each end with threaded end caps, and containing smokeless powder and an improvised detonator fashioned from the barrel of a ball point pen. The device was designed to explode when the top lid of the box was opened. Approximately eighty nails had been secured to the pipe to serve as additional projectiles upon detonation.

Two days later, on December 18, 1989, Savannah alderman and civil rights attorney Robert E. Robinson was killed after opening a package containing a pipe bomb similar to the one that killed Judge Vance. This device consisted of a steel pipe approximately seven inches in length and two inches in diameter and was sealed at each end by metal plates welded to the pipe. A threaded rod extended through the pipe and metal plates and was secured to the outer side of each plate by two steel nuts. Rubber bands secured numerous nails to the pipe. The pipe was packed with smokeless powder and a detonator fabricated from the barrel of a ball point pen. The device was rigged to detonate when the top lid of the box was opened. Attorney Robinson received the package in his Savannah law office via the United States mails.

On December 18, a package containing a pipe bomb nearly identical to the device that killed attorney Robinson was delivered to the Eleventh Circuit Court of Appeals Clerk's office in Atlanta. The device was discovered by a security guard using an X-ray machine before anyone opened the package. An identical pipe bomb was received and intercepted prior to detonation in the Jacksonville, Florida office of the NAACP.

During August and December, 1989, all Eleventh Circuit Court of Appeals judges and the Atlanta and Jacksonville offices of the NAACP received letters threatening the recipients with death. Numerous television stations also received correspondence threatening chemical warfare against major metropolitan populations.

In response to these events, federal authorities launched a monumental investiga-

---

**1.** At the April 9 hearing on defendant's pretrial motions, defendant's counsel advised that many of defendant's motions do not require the court's consideration at this time. This memorandum order does not address the following motions: Rule 16 motion for discovery and inspection [docket entry 42]; demand for production of statements and reports of witnesses [43]; motion for discovery [44]; motion for notice by the government of its intention to use evidence arguably subject to suppression [45]; preliminary motion to suppress [46] (superseded by subsequent suppression motions); motion for notice by the government of its intention to rely upon evidence of other crimes [47]; motion to preserve evidence [48]; motion for statements of persons who could arguably bind defendant [49]; *Giglio* motion [50]; preliminary motion to suppress Title III evidence [51] (superseded by subsequent motions); motion to inspect, examine, and test physical evidence [52]; motion to allow participation in voir dire [53]; motion to disclose evidence or information favorable to defendant under *Brady v. Maryland* [55]; motion identifying specific *Brady* requests [56]; motion for early disclosure of transcripts of videotape and audiotape interceptions [58]; motion for enhanced tape recordings and/or transcripts [59]. The court addresses defendant's motion for venue transfer in a separate memorandum order.

tion in an effort to identify the person or persons behind the bombing assassinations of Judge Vance and attorney Robinson and the threatening correspondence. In January, 1990, the FBI developed a lead after reviewing documents received by the Eleventh Circuit Court of Appeals. At the April 9 suppression hearing, Bureau of Alcohol, Tobacco, and Firearms Agent Frank Lee described that two letters received by the Eleventh Circuit in June and August, 1988 had been typed on the same typewriter used to type address labels on four of the package bombs. These letters had been sent by a resident of Enterprise, Alabama, Wayne O'Farrell. However, a search of O'Farrell's property in January, 1990 proved fruitless.

On January 18, 1990, agent Lee reviewed the transcript of a 1972 criminal trial in which defendant Moody was convicted of possessing a pipe bomb. Agent Lee discovered numerous similarities between the 1972 device and the bombings under investigation. At this point, according to agent Lee, law enforcement officials "took a very long, hard look at Mr. Moody." The execution of subsequent search warrants and court-authorized wiretaps revealed numerous connections between defendant and the crimes charged.

In July, 1990 defendant was indicted in the Middle District of Georgia on charges of obstructing justice and suborning perjury. The charges stemmed from defendant's efforts to obtain false testimony from witnesses in a *coram nobis* proceeding in which defendant challenged his 1972 conviction for possessing a pipe bomb. A jury found defendant guilty on all counts charged in the indictment on December 14, 1990.

## Discussion

### A.

Defendant moves the court to suppress "all evidence seized as a result of the interception of defendant's oral and wire communications." These motions challenge specifically the electronic monitoring of defendant's residence and prison cell. Defendant advances essentially three grounds in support of the suppression motions as they relate to the surveillance of defendant's residence: (1) the affidavit supporting the initial wire and oral intercept did not establish probable cause to think that discussion of the bombing offenses was occurring in defendant's residence; (2) the government failed to demonstrate, in connection with the obstruction of justice offenses, that electronic surveillance was necessary; and (3) government agents failed to minimize the electronic interception.

 18 U.S.C. § 2518(3) permits the issuance of an electronic surveillance order if a judge determines on the basis of a supporting affidavit that:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The showing of probable cause required under § 2518(3) is substantively identical to that required under the fourth amendment. *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir.1990). "The issuing magistrate is to make a 'practical, commonsense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought for evidence will be obtained." *Id., citing, Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. Domme*, 753 F.2d 950, 953 (11th Cir.1985). In passing upon the validity of the authorization, the court accords "great deference" to the issuing judge's probable cause deter-

mination. *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir.1982).

With respect to defendant's first argument in support of suppression, the court finds that FBI Special Agent John D. Behnke's 88–page affidavit dated April 1, 1990 [hereinafter "Behnke Aff."] establishes probable cause to think that defendant committed the offenses under investigation and that communications regarding the offenses under investigation would occur inside defendant's residence. The court summarizes those portions of agent Behnke's affidavit which are particularly significant to the probable cause determination: A bomb expert with the FBI examined each of the December, 1989 mail bombs and determined that the same person or persons manufactured each device. Behnke Aff. ¶¶ 18–19. Agents discovered numerous similarities between the December, 1989 bombs and the package bomb recovered in 1972 from defendant's possession and likely manufactured by defendant. *Id.* ¶ 25(a)–(k). Indeed, of the approximately 17,000 bombs investigated by the FBI and described in the Bureau's computer banks and files, only the December, 1989 bombs and defendant's 1972 bomb make use of "metal end plates, threaded rods extending from plate to plate, and secured with nuts." *Id.* ¶ 26. Upon searching a storage area rented by defendant, agents discovered a prototype device with characteristics identical to all four December mail bombs. *Id.* ¶ 33. FBI interviews with retail hardware suppliers revealed that defendant frequented several stores with his wife and purchased materials identical to those utilized in the December mail bombs. *Id.* ¶¶ 85–88. One store owner specifically recalled that defendant and his wife were "secretive about what they were doing" with the materials. *Id.* ¶ 87. One of defendant's neighbors, Rozene Ledbetter, described to federal investigators that defendant and his wife adamantly denied owning a portable typewriter, though Ledbetter had borrowed a portable typewriter from the Moodys some two years earlier. *Id.* ¶¶ 93–97. Ledbetter inquired about the typewriter after hearing news reports that federal investigators were looking for the typewriter in connection with the mail bombings and that defendant was a target of the investigation. *Id.* ¶¶ 94–95. A detailed FBI investigation into court records revealed defendant's penchant for litigation and a motive for the mail bombings. *Id.* ¶¶ 40–42. Judge Vance participated in two of defendant's appeals to the Eleventh Circuit. *Id.* ¶ 41(d). In the first action, the panel ruled against defendant, dismissing his appeal (Judge Vance was assassinated prior to decision on the second appeal). Attorney Robinson was a partner of attorney Michael C. Ford; Ford represented defendant in legal matters before the Eleventh Circuit. *Id.* ¶ 42. Agent Behnke's affidavit also reveals that defendant, with the assistance of his wife, attempted to influence persons called to testify before a federal grand jury investigating the December, 1989 mail bombs. *Id.* ¶¶ 67–75. Defendant, in separate letters delivered by his wife to a witness, threatens the witness's mother and instructs the witness how to answer questions before the grand jury. *Id.* ¶¶ 72(c)–(g), 73.

Further, agent Behnke's affidavit establishes the probability that conversations concerning the investigated offenses would occur in defendant's residence by detailing Susan McBride's (defendant's former wife) intimate involvement in defendant's activities. As the above-described facts reveal, McBride delivered letters for defendant in connection with defendant's attempt to influence the grand jury testimony and accompanied him on numerous trips to the hardware store. McBride has testified in a deposition that she does all of defendant's typing. *Id.* ¶ 61: The affidavit also reveals that defendant and McBride operated a business from within the home, that neither was employed outside the home, and that the two usually remained in their residence when not running errands. *Id.* ¶¶ 46–47, 82–83.

Defendant's second argument is that, with respect to the obstruction of justice offenses, the government failed to demonstrate the requisite element of necessity for the wiretaps. *See*, 18 U.S.C. § 2518(3)(c). According to defendant, the

information provided by the obstruction informant, Julie Linn–West, established the government's obstruction case and obviated the need for any wiretap. When coupled with defendant's earlier contention that the Behnke affidavit failed to establish probable cause that defendant committed the bombing offenses or that discussions concerning the bombing offenses would occur in defendant's home, defendant concludes that all evidence obtained as a result of the wiretaps must be suppressed. Significantly, defendant does not appear to dispute (1) that the affidavit established probable cause with respect to the obstruction of justice offenses, or (2) that the affidavit established the element of necessity with respect to the bombing offenses.

With respect to the issue of necessity, the Eleventh Circuit Court of Appeals offers the following guidance:

> The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.

*United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir.1986), *cert. denied*, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986) (citations omitted).

■ At the outset, the court notes that defendant's necessity challenge is germane only if the court first determines that the government failed to establish probable cause in connection with the bombing offenses. As the court has held that agent Behnke's affidavit establishes the requisite probable cause, defendant's necessity challenge appears moot. Nonetheless, the court finds that the affidavit satisfies the necessity requirement. Agent Behnke describes in exhaustive detail the investigative methods pursued and the reasons why further use of those tactics likely would prove futile. Behnke Aff. ¶¶ 102–117. Agent Behnke also explains why other, un-

tried methods (e.g. grand jury investigation, suspect interviews) would prove futile.

Finally, defendant attacks the electronic surveillance of his residence on the ground that the government failed to adequately minimize its detection efforts. In this regard, defendant avers: "in flagrant disregard of the authorization order, the agents apparently activated the bug routinely at times when [defendant] was home alone and at times when it was obvious that [defendant] was not talking to either his wife or to any coconspirator." Defendant specifically challenges the government's minimization efforts in connection with recorded conversations defendant had with himself in which defendant is alleged to have said "Now you've killed two (unintelligible); now you can't pull another bombing," and "Mmm-huh bullshit, anytime you're dealing with the court you're dealing with a goddamn crook."

■ Electronic surveillance must be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The determination of whether the government's minimization efforts were reasonable "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time [of surveillance]." *Scott v. United States*, 436 U.S. 128, 135–37, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978). The standard to be applied is one of reasonableness. *Van Horn*, 789 F.2d at 1501. "The standard does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, 436 U.S. at 140, 98 S.Ct. at 1724. In analyzing minimization challenges, courts have recognized that it normally takes investigating officers one or two minutes to determine the parties to and subject matter of an intercepted conversation. *See, e.g., United States v. Armocida*, 515 F.2d 29, 45 (3d Cir.1975), *cert. denied, Conti v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Capra*, 501 F.2d 267, 275–

76 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).

▇▇▇ The court finds that the government sufficiently minimized its detection efforts. With respect to the April, 1990 surveillance of defendant's residence, monitoring equipment was activated during twenty-five of thirty possible days on approximately 5,409 occasions. Of the 5,409 total intercepts, no more than 296 endured for longer than two minutes (approximately five and one-half percent). At the April 9 hearing on defendant's pretrial motions, the government established that monitoring agents had a difficult time determining with immediacy whether both defendant and McBride were in the home and that spotting agents' reports were often inaccurate.[2] On a number of occasions, the spotting agent informed monitoring agents that both defendant and McBride were in the home only after monitoring agents intercepted conversations between the two. With respect to the recorded comments defendant made to himself, the court finds that monitoring agents acted reasonably in monitoring defendant's comments for a brief period of time to determine whether defendant was speaking to anyone else.

### B.

Defendant also seeks the suppression of all evidence obtained as a result of the electronic monitoring of his prison cell. This monitoring commenced after defendant was arrested in connection with the obstruction of justice and subornation of perjury charges in July, 1990 and jailed in the high-security unit of the Atlanta Federal Penitentiary. The basis for defendant's attack upon the electronic monitoring of his prison cell is somewhat unclear. In his supplemental brief, defendant attacks the surveillance upon two grounds: (1) that the affidavit underlying the issuance of the original surveillance order is misleading and, if purged of its misleading components, fails to establish probable cause[3], and (2) that the monitoring of defendant's cell was unethical and violated defendant's fifth and sixth amendment rights.

In support of an application to monitor defendant's prison cell, agent Behnke submitted an affidavit dated July 24, 1990 ("Behnke Aff. II") in which he summarizes the results of the electronic monitoring of defendant's residence:

> I notice a pattern wherein WALTER LEROY MOODY, JR. regularly talks and whispers to himself at the subject location. On at least thirteen (13) occasions, Walter Moody is overheard whispering to himself.

Behnke Aff. II ¶ 12. It appears this information was offered to demonstrate the likelihood that defendant would carry on further revealing conversations with himself in his prison cell. Defendant characterizes the July 24 affidavit as misleading because agent Behnke failed to describe to the issuing judge the magnitude of the surveillance conducted at defendant's residence. According to defendant, viewed in the context of the entire month-long surveillance, that defendant is recorded speaking to himself thirteen times is insignificant. Defendant also contends that it was misleading for agent Behnke to include ¶ 15 in the affidavit, alleging that defendant muttered "Now you've killed two (unintelligible); now you can't pull another bombing." Defendant contends that it is impossible to determine what is said on the recording.

▇▇▇ That agent Behnke failed to describe the magnitude of the surveillance at defendant's residence does not appear significant as the same judge[4] authorized both interceptions and was, in all likelihood, familiar with the scope of the surveillance of defendant's residence. Regarding de-

---

**2.** "Monitoring agents" refers to those persons responsible for activating periodically the listening and recording equipment and determining whether the intercepted communication or conversation should be recorded. "Spotting agents" refers to those responsible for eyeing defendant's residence to determine the existence and identity of persons in the home.

**3.** Defendant did not press this argument substantially at the April 9 hearing.

**4.** The Honorable Richard C. Freeman, United States District Court for the Northern District of Georgia.

fendant's challenge to the clarity of the statement contained in the tape recording cited at ¶ 15 of the affidavit, agent Behnke testified as follows at the April 9 hearing:

Q [Mr. Shapiro]: What was your basis for including [paragraph 15] in the affidavit?

A: I listened to the tape and that is what I heard on the tape.

Q: How many times was it necessary for you to listen to the tape before you determined what it said?

A: I heard that the first time I listened to the tape.

Transcript of April 9 Hearing at 54–55. The agent further testified that approximately "a half dozen" other agents listened to the tape and independently arrived at the same conclusion. *Id.* at 55–56, 61. The court finds this testimony highly credible and further finds that the July 24 affidavit establishes probable cause to think that defendant would continue muttering revealing statements to himself within the confines of his prison cell.

 Defendant bases his ethical challenge to the prison surveillance on *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), *cert. denied,* — U.S. —, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990).[5] In *Hammad,* the Second Circuit United States Court of Appeals held that Model Code of Professional Responsibility DR 7–104(A)(1)[6] applies to prosecutors during the investigation of a criminal matter. *Id.* at 838. However, the court counseled "restraint in applying the rule to criminal investigations to avoid handcuffing law en-

forcement officers in their efforts to develop evidence." *Id.* The court also recognized that prosecutor activity which is "authorized by law" may not be restricted under the rule. *Id.* at 839. The court assumes, *arguendo,* that *Hammad* applies. Here, the court-authorized electronic surveillance of defendant's prison cell falls within *Hammad*'s "authorized by law" exception. The court rejects defendant's "ethical" objections to the prison surveillance.

### C.

 Defendant argues that all evidence obtained as a result of the search of a basement at 3360 Hardee Avenue, Chamblee, Georgia must be suppressed as violative of the fourth amendment. Defendant leased a portion of the Chamblee basement for storage purposes. Pursuant to a consent search,[7] agents entered the basement of the Chamblee residence and viewed several cardboard boxes on pallets. These boxes and items resting on the pallets belonged to defendant. While viewing the boxes and surrounding area, agents discovered a piece of galvanized pipe with threaded caps attached to each end resting on one of the pallets. One of the threaded caps was welded to the piece of pipe. Agents recognized the pipe's similarity to the December package bombs and, rather than immediately seizing the evidence, sought to obtain a search warrant. The affidavit in support of the search warrant fails to note the presence of the pipe.

Defendant contends that the affidavit underlying the Chamblee search warrant

---

**5.** The court rejects defendant's challenge to the prison cell surveillance to the extent it is based on the fifth and sixth amendments. Defendant's right to counsel in the case presently before the court had not attached as of July, 1990. *See, Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985). Further, the government, via erection of a "Chinese wall," sealed the prosecution team in the obstruction of justice case from access to information gained through the prison surveillance. Defendant has pointed to no evidence suggesting that this procedure proved ineffective. Finally, agents monitoring defendant's cell were under orders not to intercept conversations between defendant and his lawyers. Defendant's counsel has reviewed all recordings of the prison sur-

veillance and admits that none contain privileged material.

**6.** DR 7–104(A)(1) provides:

A. During the course of his representation of a client a lawyer shall not:
1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

**7.** Defendant does not dispute that federal agents were lawfully in the Chamblee basement pursuant to the consent search.

failed to establish probable cause to think that evidence of criminal activity would be found in the basement storage area. The government argues the affidavit was sufficient to establish probable cause and, in any event, the pipe with threaded end caps was discovered in plain view. The court finds that government agents discovered the pipe in plain view and that the search warrant was issued upon probable cause.

### D.

Defendant moves for wholesale suppression of evidence seized pursuant to all search warrants based on the February 8, 16 and March 6, 1990 affidavits of ATF agent Lee. Defendant contends that, by failing to disclose the evidence implicating O'Farrell, agent Lee recklessly omitted material information. No evidentiary hearing is required upon defendant's motion "if, when the material which is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

> [T]o be material under *Franks*, an omission must do more than potentially affect the probable cause determination: it must be 'necessary to the finding of probable cause.' For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause * * * Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing.

*United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990); *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir.1987), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987).

 Defendant has failed to demonstrate that the omitted information concerning the government's investigation of O'Farrell, if included in the affidavit, would have defeated probable cause. To satisfy the fourth amendment's probable cause requirement, the government need not demonstrate that a person is the *chief* suspect

in a criminal investigation. Indeed, implicit within the concept of probable cause is the notion that the government may pursue multiple, perhaps even divergent lines of investigation so long as the government establishes probable cause as to each prior to the issuance of any warrant. The evidence marshalled by the government against O'Farrell does not begin to exonerate defendant; nor does it detract from the government's probable cause showing as to defendant. At most the evidence indicates that defendant and O'Farrell may have conspired to commit the crimes charged. The court finds defendant's allegations insufficient to raise issues worthy of an evidentiary hearing under *Franks*.

### E.

 Finally, defendant moves under Fed.R.Crim.P. 14 to sever count 72 of the superseding indictment for separate trial. Defendant argues that the Rule 404(b) evidence the government intends to offer is admissible only as to count 72. Thus, according to defendant, a separate trial of count 72 would shorten trial of the other 71 counts and avoid confusing the jury and visiting undue prejudice upon defendant. However, the court finds that most of the Rule 404(b) evidence the government intends to offer is admissible to prove intent or motive as to other counts in the superseding indictment. The court will deny defendant's severance motion.

### Conclusion

Based upon the foregoing, and all the files, briefs, and arguments of counsel,

IT IS ORDERED that:

1. Defendant's motions to suppress evidence seized as a result of the interception of defendant's oral and wire communications at his residence and prison cell are DENIED;

2. Defendant's motions to suppress evidence seized from the basement storage area at 3360 Hardee Avenue, Chamblee, Georgia are DENIED;

3. Defendant's motions to suppress evidence seized pursuant to all search war-

rants based on the February 8, 16 and March 6, 1990 affidavits of ATF agent Lee are DENIED;

4. Defendant's motion to sever count 72 of the superseding indictment is DENIED.