**Russell Armell LAYTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09 87 020 CR.**

Court of Appeals of Texas, Beaumont.

Oct. 7, 1987.

Janet L. Spielvogel, Woodlands, for appellant.

David Bluestein, Asst. Dist. Atty., Conroe, for appellee.

## OPINION

BROOKSHIRE, Justice.

Basically, this is an appeal from the overruling of a Motion to Suppress Evidence. The evidence was contraband. Appellant was indicted for the offense of possession of a controlled substance; namely, methamphetamine of less than 28 grams.

In October, 1986, the Appellant, through his court-appointed attorney, filed several pretrial motions. One of these motions was a Motion to Suppress Evidence. After a hearing, the Court overruled the Motion to Suppress Evidence which resulted in this appeal. After denying the Motion to Suppress Evidence, the Appellant pleaded guilty to the offense of possession of a controlled substance. The judge assessed his punishment at 13 years confinement. The 13 years assessment was in accordance with a plea bargaining agreement between the Appellant and the State's attorney.

The Appellant vigorously contends that the trial court erred in denying his pretrial motion to suppress and that denial is the basis for this appeal. Indeed, it is the sole basis for this appeal.

Prior to the hearing, the parties agreed, before the court, that the Appellant was arrested without an arrest warrant and also without a search warrant on August 5, 1986. A Detective Smith arrested the Appellant for a traffic violation. The testimony of the arrest does not seem to be in serious dispute. At the time of the arrest, Detective Smith was with the Sheriff's Department in Montgomery County and was in a patrol vehicle. There was no other reason for stopping the Appellant other than the traffic violation.

Immediately after stopping the Appellant, the detective did not intend to arrest the Appellant in the sense that he had determined in his own mind to take the Appellant into custody, probably with handcuffs, and transport him to the county jail. The detective testified that it was merely a routine traffic violation stop. Immediately

thereafter, the detective did notice what he termed a "buck-type knife" with a blade about 4 inches long. It was described as a "lock blade". It was a pocket-type of knife that, after it was opened, the blade would lock itself in place and it was necessary, apparently, to press a button to close the blade again. When the detective first viewed this knife, it was in a scabbard and he could not see all of the knife.

The accused was extremely nervous. The detective also said that the accused appeared to be very furtive and spoke irregularly and failed to finish his sentences. For these reasons and others, the detective asked the accused to place the knife at a place away from the Appellant's reach. The Appellant appeared disheveled. He also became even more nervous. Because of all the surrounding circumstances, and the demeanor, speech and actions of the Appellant, the officer asked that the pocket knife be placed on the hood of the officer's patrol car. The officer testified that that was his usual practice and *that he did the same for his own safety and to protect himself.* After the knife, or buck knife, had been placed on the hood of the patrol car, the officer asked the Appellant if he had any other weapons. The Appellant's reply, according to the officer, was: "No, search me." Either those words were used or words similar to: "You can search me." The detective swore that he had permission to search the Appellant for any other type of weapon. The detective stated that he was patting him down, using the back of his own (the detective's) hands, and he tapped something in the right shirt pocket that was very hard. The detective did not remember a flap over the pocket of the shirt. It seemed to be a standard shirt pocket. The hard object was a magnetic key case. Apparently, at first, the detective had some apprehension that the hard object was a roll of nickels or some other coin.

According to the detective, when he pulled the magnetic key case from the pocket, the Appellant looked very deflated and said: "Please, I can't go back to prison." There was another version that recit-

ed that the Appellant said: "Please, I don't want to go back to prison." Whatever the words were, the detective opened the key case and it contained a baggie or plastic container in which there was a whiteish, yellowish, sticky-type of substance which appeared to be either wet or pasty. From his experience and training with the Montgomery County Sheriff's Department, the detective determined that it was some type of controlled substance. He strongly felt that it was a narcotic or contraband. Whereupon, the detective swore he gave all the Miranda warnings to the Appellant.

After giving the Miranda warnings, he asked the Appellant what was the substance and the detective said the Appellant replied: "Crystal. Please don't send me back to prison." According to the record, crystal is a slang term for methamphetamine. At that point, the detective put handcuffs on the Appellant and called dispatch and asked for an Organized Crime Unit, or a narcotics officer, to meet them. The narcotics officer, who met the officer and Appellant, was a Detective Armatys.

The Appellant took the stand, for limited purposes, and denied giving permission for the search and denied the words attributed to him by Detective Smith.

In a later part of the proceeding, on the Motion to Suppress, the detective reemphasized that the appearance of the knife in his belt, combined with the apparent, extreme nervousness and demeanor of the accused, gave Detective Smith real concern for his own safety.

The trial judge conducted a careful and detailed hearing and accepted the arresting detective's narrative. When the detective first felt the hard object in Appellant's shirt pocket, he was apprehensive that it could be a weapon. When patting down a shirt, the detective said that he was searching only for something that could harm him and that his only concern, at that point, was for his own safety in searching for weapons, saying: "That's all I was looking for...." The detective swore that he only opened the key case after the Appellant had made his voluntary remark about not wanting to go back to prison.

We think that the trial court's ruling on the Motion to Suppress Evidence was correct under this record. We opine that it is now well-established by statute and precedent that a law enforcement officer may stop a person seen to be committing a traffic offense. *TEX.REV.CIV. STAT.ANN. art. 6701d, secs. 147, 148, 153* (Vernon 1977). *Article 6701d, sec. 153* provides:

"Any peace officer is authorized to arrest without a warrant any person found committing a violation of any provision of this Act."

*Tores v. State*, 518 S.W.2d 378 (Tex.Crim. App.1975).

Furthermore, a law enforcement officer is permitted to take reasonable precautions to safeguard his own personal safety or security in the process of making a stop or an arrest. *State v. Riley*, 240 Or. 521, 402 P.2d 741 (1965). These cases should be judged from a totality of the circumstances surrounding the stop or arrest. *Wimberly v. State*, 434 S.W.2d 857 (Tex.Crim.App. 1968).

The court, in *Wimberly, supra*, wrote, at pages 859 and 860:

"An 'officer should be permitted to take every reasonable precaution to safeguard his life in the process of making an arrest.'

"If from the totality of circumstances presented to the officer he has a reason to believe that he is in danger of bodily harm or injury or that the person he encounters is armed or is dangerous, justification for search of weapons exists. [Citations omitted]"

We determine that the case of *Williams v. State*, 726 S.W.2d 99 (Tex.Crim.App. 1986) is highly persuasive and probably controlling of this appeal. In *Williams*, a police officer observed a pickup truck that was illegally parked. Since the truck was illegally parked and suspicious acts between the driver and another person were taking place, it was proper for a stop, brief investigation and possible arrest to follow. The police officer observed a person, a second individual other than the driver, hand

something to the defendant and then walk away. It appeared to be a brown paper sack or bag. The police officer, in *Williams,* stated, in substance, that when the second individual, "the guy standing outside the vehicle", walked away from the pickup truck, the driver looked like he made some kind of a downward movement in the pickup truck.

By the time the Houston police officer arrived at the truck, the accused, Williams, was outside the truck standing by the open door. It was at this point that the police officer noticed a brown paper bag on the floorboard of the pickup truck, on the driver's side. The officer then pulled the sack towards him and looked inside of it. He reached inside and removed a shirt. The shirt was lying on top of another inner, smaller sack. At that point, the Houston police officer saw a gunbarrel protruding from the second inner sack. The officer, Gildehaus, testified that the sack was within the accused's, Williams', reach as Williams stood outside the truck. When Gildehaus was asked why he went into the truck and took the sack, he replied: "Two reasons. Narcotics and for my safety."

The Court of Criminal Appeals held that the search of the sack was a search incident to a lawful arrest. The Court of Criminal Appeals cited, with approval, *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), where the United States Supreme Court wrote, in part:

> "We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action ... The Courts of Appeals which have considered the matter have likewise generally followed these principles, first examining the challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved."

We decide that the officer, after viewing the total demeanor, attitude, actions and speech of the Appellant, could properly pat down the person of the Appellant. To do so, Appellant could not leave the scene and had no practical liberty to do so. Under this unusual record, the exigencies and vicissitudes of this unusual fact situation justified the pat down or contemporaneous search, without a warrant, of the person of the Appellant. In this case, the Appellant was riding a motorcycle and was not a passenger or driver in an automobile. Therefore, in reality, there was no surrounding area to be searched and such searches and pat down procedures have long been held reasonable, valid and constitutional because of the imperative need to remove any weapons that the "stoppee", or "arrestee", might attempt to use to resist arrest or to bring about his escape.

The officer, on the other hand, under this record, had the right to pat down the Appellant to remove any weapons that could imperil his personal safety or security. Again, the evidence is ample that the officer was very concerned about his own safety. Another important reason for such search and pat down is the need to prevent the concealment or destruction of evidence. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.E.2d 768 (1981).

There was a lawful stopping in this case which led, in practicality, to a lawful custodial arrest when the accused, upon the discovery and delivery of the magnetic key container to the officer, blurted out something like: "Please don't send me back to the penitentiary", "I can't stand to go back to the penitentiary" or "I don't want to go back to the penitentiary", or words of similar meaning. Hence, a full search of the person was a reasonable search. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). We decide that it was reasonable for the officer to open the key container after the accused's statement about not wanting to go back to prison; and, indeed, the accused's blurted-out statements created a new impetus of probable cause to look inside the key container to see if it contained anything that might enable the Appellant to resist arrest

or escape arrest or to prevent the concealment or destruction of evidence. *New York v. Belton, supra.*

Indeed, if the "stop" or the later "frisk" gave rise to probable cause to believe that the suspect had committed a crime or was, at the present time, probably committing a crime; then it was reasonable for the law enforcement official to effect a custodial arrest and conduct a full, adequate and meaningful search of the person of the accused. And if, during the search, the officer reasonably thought that a container was concealing evidence, then the opening of such container—here, a metallic key container—was justified. *See and compare Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, reh. den. 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983).

Accordingly, we determine that Detective Smith's search of the shirt pocket and the magnetic key container was justified as a search incident to arrest. *Williams v. State, supra.* The judgment below is affirmed.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. The majority holds that the search of the shirt pocket and the magnetic key container was justified as a search incident to arrest relying on *Williams v. State,* 726 S.W.2d 99 (Tex. Crim.App.1986). They determine that *Williams* is "highly persuasive and probably controlling." I agree that it may be highly persuasive, but disagree that it is necessarily controlling. A very wide reading of *Williams* would seem to indicate that a peace officer can search the person and vehicle of any motorist stopped for any traffic violation except speeding. This is predicated on the officer's ability to arrest and jail every offender except speeders. *TEX.REV.CIV.STAT.ANN. art. 6701d, sec. 148(a)* (Vernon Supp.1987) does not envision that every stop for a traffic violation is an arrest. After a stop the officer has

the discretion, in every offense except speeding, to issue a written summons or effectuate a custodial arrest. Although *Williams* quotes the language in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the footnote seems to indicate that the court will look, to some extent, to the facts leading up to and surrounding the arrest.

In the instant case, the officer was perfectly justified in stopping the motorcycle rider for failure to signal for a turn. *TEX. REV.CIV.STAT.ANN. art. 6701d, sec. 68* (Vernon 1977). He was further justified to pat down the rider for weapons. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Once he found the magnetic key container, I do not believe he was justified in searching further. The officer admitted he had not placed the rider under custodial arrest at that moment. He stated it was his policy to make the determination later as to whether or not he would issue a summons or effect a custodial arrest. In the officer's own words:

Q. And when you intended to pull him over and in fact did pull him over for the traffic violation, did you expect or did you have any reason to believe that there was criminal activity going on other than the traffic violation?

A. No, ma'am.

Q. Did you intend to arrest him at that time for the traffic violation?

A. No, ma'am.

Q. Was it your intention strictly to write him a traffic citation and allow him to leave?

A. No, ma'am.

Q. What was it your intention to do?

A. My intention was to investigate the traffic offense and determine if the citation was necessary or an arrest was necessary. At the time I did not know what I was going to do.

. . . .

Q. Okay. Upon viewing an operator attempt to make a right hand turn without signaling and upon your observance of a traffic violation happening at that time, do you normally intend to arrest the op-

erator of that vehicle and place that person in custody?

A. There is normally no intention at the time I observe a traffic violation other than to investigate the offense. I leave my mind open.

Q. And was your mind open also at the time that you witnessed Mr. Layton fail to make his right hand turn signal?

A. Yes, ma'am. It deserved investigation at that point. That was all I was doing.

Absent a search incident to arrest or an inventory of the person following a valid arrest and before incarceration, probable cause for the search was required. Probable cause is more than suspicion or hunch. The officer very candidly supplied his reason for opening the key container. He stated:

Q. All right. Thank you. Prior to opening the keycase, did you ask Mr. Layton what was inside?

A. No, ma'am.

Q. Was it merely then your curiosity as to the comment that he had made that caused you to open up that keycase?

A. I am having a little trouble with the word 'curiosity' but I suppose that pretty well describes it. Suspicion would be a more accurate term.

. . . .

Q. Okay. At what point did you open the keycase, before he made the remark or after?

A. Before or after he made the remark, immediately upon my removing it and it becoming visible, he made the remark. If you ask me to number the things that happened, I would say I reached into his pocket, pulled out the keycase, he looked at it, and then he made the remark.

Q. You opened it only after he had made the remark?

A. Yes, sir. That's what made me suspicious of what the keycase being more than just simply a weapon by which he might harm me or not.

This does not amount to probable cause to search the keycase. The motion to suppress should have been granted. For the reasons stated, I would sustain the points of error. The majority having not done so, I respectfully dissent.