Filed 9/21/23  P. v. Barclay CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DYLAN ANDREW BARCLAY,<br><br>    Defendant and Appellant. | B323347<br><br>(Los Angeles County<br>Super. Ct. No. BA486877) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael Garcia, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General for Plaintiff and Respondent.

Defendant Dylan Andrew Barclay challenges the trial court's denial of his motion to suppress evidence obtained when police detained him and searched his vehicle. We affirm.

## FACTUAL SUMMARY

### A. *Procedural Background*

In April 2020, the People charged defendant by complaint with: possession of a firearm by a felon (count 1; Pen. Code, § 29800, subd. (a)(1));[1] unlawful possession of ammunition (count 2; § 30305, subd. (a)(1)); and misdemeanor vandalism by graffiti (§ 594, subd. (a)). The complaint further alleges that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subds. (b)(1)(A) & (d)), that defendant had a prior strike conviction in 2015 (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and that he had been previously convicted of a serious felony (§ 667, subd. (a)(1)).

The charges were based in part on a shotgun, shotgun ammunition, and cans of spray paint found during a search of defendant's car. Prior to the preliminary hearing, defendant moved to suppress the seized evidence. On April 14, 2021, a magistrate denied the motion and held defendant to answer the charges.

On June 29, 2021, defendant filed a motion in the trial court for a "special hearing" to suppress the seized evidence pursuant to section 1538.5, subdivision (i). After a hearing held on November 3, 2021, the court denied the motion.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

On June 9, 2022, defendant pleaded no contest to possession of a firearm by a felon (§ 29800, subd. (a)(1)) and felony vandalism (§ 594, subd. (a)).  The court accepted the plea, found the defendant guilty of these charges, and dismissed the remaining possession of ammunition count and the enhancement allegations.  The court sentenced defendant to a prison term of 3 years 8 months, suspended execution of the sentence, and placed him on probation for two years.

Defendant timely appealed.

### B.    *The First Motion To Suppress*

Defendant's first motion to suppress and the preliminary hearing were heard together on April 14, 2021.  Los Angeles Police Department Officer Daniel Guevara testified as follows.  Officer Guevara was assigned to investigate gang crime and, specifically, to monitor gangs in the Boyle Heights community of Los Angeles, including the White Fence gang and a rival gang, the Indiana Dukes.  He has testified in criminal prosecutions as a gang expert 20 times, including 12 times concerning the White Fence gang.  The primary activities of White Fence include vandalism, weapons possession, robberies, assault with a deadly weapon, and murder.

Officer Guevara is familiar with White Fence's and its rivals' territorial claims.  According to Officer Guevara, graffiti vandalism by gang members in rival gang territory is ordinarily conducted in groups of two or more armed members.  Typically, one gang member will graffiti—or tag—a wall while one or more other members act as "look-outs."

On the night of April 25, 2020, Officer Guevera was driving with his patrol partner, Officer Guendyke, eastbound on Olympic Boulevard.  As they approached Indiana Street, Guevara saw a

man run from a gas station southbound across Olympic, approach a wall, and begin "to write 'White' on the wall with graffiti." The area is within territory claimed by Indiana Dukes. When the tagger noticed Officer Guevera's patrol vehicle, he "tossed the can of 'graffiti' " into a neighboring residential yard, jumped over the wall, and ran.

Officer Guevara did not pursue the tagger. Because he was aware that the incident took place in territory claimed by a White Fence rival, he told Officer Guendyke to "look for the layoff vehicle"—that is, the vehicle in which other gang members would be acting as lookouts.

Officer Guevara looked at the gas station from where he had seen the tagger running, and saw defendant getting out of a vehicle at the station. A woman was sitting in the passenger seat of the car.

Officer Guevara drove to the gas station. Officer Guevara "shared brief words with [defendant], and immediately . . . recognized" him as a White Fence gang member. Officer Guevara explained that, in testifying as a gang expert, he had previously used defendant's prior robbery conviction as evidence of a predicate offense in a case involving a gang allegation. Upon recognizing defendant as a White Fence gang member, Officer Guevara "confirmed" in his "mind" that defendant was acting as a lookout for the graffiti perpetrator.

Officer Guevara informed defendant that he "was going to detain [defendant] pending a vandalism investigation." Officer Guevara then placed defendant "in handcuffs in order to prevent the situation from escalating and for officer safety."

As Officer Guevara placed defendant in handcuffs, he observed a spray paint can—"a tool that's often used in gang

4

graffiti"—on the rear seat behind the driver's seat. Meanwhile, Officer Guendyke ordered the female passenger to exit the vehicle and placed her in handcuffs.

Officer Guevara then approached the passenger side of the car and saw the "pistol grip of a shotgun in the floorboard." He removed the shotgun from the vehicle and removed four live 12-guage rounds of ammunition from the firearm.

Officer Guevara then searched defendant and found an additional 12-guage round of ammunition in his pocket.

The female passenger had a notebook containing "handwritten graffiti with White Fence associated writing," including gang member monikers.

On cross-examination, Officer Guevara testified that he did not see the tagger exit defendant's car. He further stated that, in addition to the spray paint can he saw in the back seat, he saw a spray paint can in the front seat; the police, however, collected only one spray paint can as evidence. Officer Guevara also admitted that in his written report of the incident, he stated that he searched the car to look for marijuana, and his report did not mention that he saw a spray paint can prior to searching the car. The reason he wanted to search for marijuana, Officer Guevara explained, was because defendant told him he had some marijuana in his pocket.

The magistrate denied the motion to suppress. The court characterized the initial restraint of defendant as a "detention," and said it was based on a reasonable suspicion of criminal activity. The court explained that the detention was supported by the facts that a White Fence tagger had run from the direction of the gas station to commit vandalism in a rival gang's territory and defendant's car was "parked there at the gas station waiting

for the suspect to finish his deed"; and because Officer Guevara recognized defendant as a White Fence gang member, and gang members who act as backup for another gang member "usually . . . have firearms," the court continued, the officers could use handcuffs during the detention and "frisk and search."

But, the court added, Officer Guevara's "credibility" about the spray paint cans goes "out the window." The court noted that Officer Guevara referred to a spray paint can in the back seat and a second can in the front seat, but police took only one can into evidence. The court then asked rhetorically, "So which is it? Is there two cans or one can or is this made up? Was there one in the front seat or one in the back seat? That's just ridiculous." The court also initially expressed doubt as to whether the shotgun was in plain view because the defendant's "moving papers" state that the shotgun "is under a rag." The court, however, appeared to accept the prosecutor's argument that the firearm's "grip" was "sticking out from the rag" and was in plain view. Ultimately, the court concluded that, "even with the credibility issues," it "would deny the motion."

## C.    *Defendant's Motion for a Special Hearing*

In June 2021, defendant filed a motion for a "special hearing" under section 1538.5, subdivision (i) to suppress "all evidence obtained in this prosecution." The People filed opposition on September 10, 2021, and defendant filed a reply three days later.

The special hearing was held on November 3, 2021. During the hearing, Officer Guevara authenticated a video of the detention and arrest of defendant recorded by a "body worn video" camera attached to Officer Guevara's uniform. The video

6

recording, together with Officer Guevara's explanatory testimony, shows the following.

It appears that Officer Guevara is driving eastbound on Olympic Boulevard.  Although the video at this point shows little more than the steering wheel of the patrol car, Officer Guevara testified that he saw a Hispanic male running southbound across Olympic.  He saw the man using a spray paint can to vandalize a wall with the word, "White," which Officer Guevara understood as a reference to the White Fence street gang.  Officer Guevara looked back across Olympic in the direction from which the tagger ran, and then turned his car sharply left across the westbound lanes of Olympic into a gas station.  Defendant can be seen on the video recording standing outside the driver's side front door of a car parked adjacent to the gas pumps.  A female passenger is in the front passenger seat.  Neither of them makes any furtive gestures or attempt to flee.

Officer Guevara exits the patrol car and immediately places defendant in handcuffs.  Meanwhile, Officer Guendyke walks to the other side of the car and directs the female passenger out of the front seat.  He leaves the car door open.  After defendant is placed in handcuffs, Officer Guevara activates the audio on his body worn camera.

Officer Guevara conducts a pat-down frisk of defendant, then looks at defendant's driver's license and asks, "Why are you back in town, man?  Don't you live in Ontario or something?"  Defendant tells Officer Guevara that he lives in San Bernardino and that he is in the area because his grandfather, who "lives over here," "had [defendant] bring him his medicine."  Approximately 1 minute 10 seconds after Officer Guevara began to handcuff defendant, Officer Guevara informs defendant that

he was "being detained right now for this vandalism investigation."

Officer Guevara shines a flashlight inside the front driver's side of the car for about two seconds, then into the back seat area for about four seconds. What appears to be a can of spray paint is briefly visible on the back seat of the car behind the driver's seat. During the time Officer Guevara is looking into the car with the flashlight, he does not mention the paint can.

During the special hearing, Officer Guevara was shown a still photo excerpted from another officer's body worn video that shows a can of spray paint on the back seat of the car. Officer Guevara testified that "[i]t is the spray can I saw in the back seat."

Officer Guevara then returned to his patrol car for several minutes where he checked defendant's identifying information through a computer system.

As Officer Guevara returns from his patrol car and walks toward the front passenger side of defendant's car, defendant tells Officer Guevara that he has some "weed on [him]." As Officer Guevara approaches the open front passenger door, a can of spray paint is visible on the front passenger seat. Officer Guevara then shines a flashlight into the front passenger area of the car and sees the pistol grip of a shotgun protruding from a cloth or rag on the floorboard. He pulls the gun from the car and removes four shotgun shells from the gun. After placing the gun and shells in the trunk of his car, Officer Guevara returns to the front passenger side of the car and removes a spray paint can and places it on top of the car.

When Officer Guevara informed defendant that he will be taken "to the station," defendant informed Officer Guevara that

8

he has "a shell" in his coat pocket. Officer Guevara found and removed a shotgun shell.

Meanwhile, additional officers arrive and, at Officer Guevara's direction, search the trunk and back seat area of defendant's car where they find spent and live shotgun shells.

Officer Guevara looked into the driver's side back seat area (the door to which is now open) and removed from the seat a can of spray paint. He places it on the top of the car with the comment, "[w]e have a couple cans of spray paint."

On cross-examination, counsel again elicited from Officer Guevara that he had stated in his report that he had searched the car for marijuana and did not mention that he saw a spray paint can. Officer Guevara further stated that he did not see the tagging suspect "coming from a vehicle." When defense counsel asked Officer Guevara to confirm that there was "[n]othing to link anything that the tagger did to what [defendant] was doing, except for [his] training and experience," Officer Guevara agreed. Counsel then asked, "You had a hunch?" Officer Guevara responded, "Yes."

The court heard argument and denied the motion. The court explained: "The facts from the preliminary hearing as well as the special hearing demonstrate[ ] that Officer Guevara handcuffed the defendant because he was present at an area of suspected criminal activity. Handcuffing the defendant elevated the initial encounter to the factual arrest requiring probable cause." The court stated that "Officer Guevara lacked probable cause to arrest the defendant since the only articulable and particularized facts he relied on in arresting the defendant was his presence."

9

Relying on the "attenuation doctrine," however, the court denied the motion, stating:  "[N]otwithstanding the findings of the preliminary hearing judge as to the facts, based on the new evidence and the total presentation of the evidence, the court finds that there are intervening circumstances that interrupted the connection between the legal [*sic*] arrest or detention and the seized evidence."[2]  In particular, the court relied on the body worn video, which shows Officer Guevara "looking into the vehicle with his flashlight," and his testimony that he saw the spray paint can in the rear seat in plain view.  He then walks to the other side of the vehicle and, "again shining his flashlight, sees the butt of a firearm and another spray can in plain view."

## DISCUSSION

### A.    *Standards of Review*

A defendant may file a motion to suppress at the preliminary hearing based on the evidence introduced at that hearing.  (§ 1538.5, subd. (f)(1).)  The prosecution has the burden of proving by a preponderance of the evidence that the search and seizure are valid.  (*People v. Johnson* (2006) 38 Cal.4th 717, 723 (*Johnson*).)

If, as here, the defendant was held to answer at the preliminary hearing, the defendant may renew his motion to

---

[2] Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' "  (*Utah v. Strieff* (2016) 579 U.S. 232, 238.)

10

suppress or "make the motion at a special hearing relating to the validity of the search or seizure." (§ 1538.5, subd. (i).) At the hearing, "the people may recall witnesses who testified at the preliminary hearing." (*Ibid.*) "The court shall base its ruling on all evidence presented at the special hearing and on the transcript of the preliminary hearing, and the findings of the magistrate shall be binding on the court as to evidence or property not affected by evidence presented at the special hearing." (*Ibid.*)

"A defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty." (§ 1538.5, subd. (m).)

On appeal, " 'we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232; accord, *Ornelas v. United States* (1996) 517 U.S. 690, 697.)

## B. *Discussion*

### 1. **Legal Principles**

"The Fourth Amendment protects against unreasonable searches and seizures." (*People v. Casares* (2016) 62 Cal.4th 808, 837; *People v. Hernandez* (2008) 45 Cal.4th 295, 299 (*Hernandez*).) A seizure for purposes of the Fourth Amendment includes temporary detentions as well as arrests, and "occurs whenever a police officer, 'by means of physical force or show of authority,' restrains the liberty of a person to walk away."

11

(*People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*), quoting *Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16 (*Terry*); accord, *People v. Brown* (2015) 61 Cal.4th 968, 974.)

Although an officer must have probable cause to believe that a suspect is committing or has committed a crime before arresting the suspect (*Hunter v. Bryant* (1991) 502 U.S. 224, 228), police may conduct a brief investigative detention when there is " ' "some objective manifestation" that criminal activity is afoot and that the person to be stopped is engaged in that activity.' " (*People v. Celis* (2004) 33 Cal.4th 667, 674 (*Celis*).)  A valid investigatory detention must be supported by "specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza*, *supra*, 9 Cal.4th at p. 231.)  The "totality of the circumstances" (*United States v. Cortez* (1981) 449 U.S. 411, 417 (*Cortez*)), may include the officer's knowledge "of the modes or patterns of operation of certain kinds of lawbreakers." (*Id.* at p. 418.)  Officers are thus permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " (*United States v. Arvizu* (2002) 534 U.S. 266, 273; accord, *Hernandez*, *supra*, 45 Cal.4th at p. 299.)  Although police may not detain someone based solely on the person's suspected gang membership (*People v. Rodriguez* (1993) 21 Cal.App.4th 232, 238–240), an officer's knowledge that the detained person is a gang member "on another gang's 'turf' " may be considered together with other relevant facts in assessing whether there is reasonable suspicion for detention (*In re Hector R.* (1984) 152 Cal.App.3d 1146, 1153).

When officers lawfully detain an individual based on a reasonable suspicion, the officers may, incident to the detention, undertake "investigative methods," provided they are "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (*Florida v. Royer* (1983) 460 U.S. 491, 500; see *Celis*, *supra*, 33 Cal.4th at pp. 675–676 [valid investigatory methods during temporary detention are "those necessary to effectuate the purpose of the stop, that is, to quickly dispel or confirm police suspicions of criminal activity"].) Looking into the windows of a detained suspect's car with or without a flashlight does not violate the Fourth Amendment. (*Texas v. Brown* (1983) 460 U.S. 730, 739–740; *Wimberly v. Superior Court* (1976) 16 Cal.3d 557, 564; *United States v. Orozco* (9th Cir. 1979) 590 F.2d 789, 792.)

If a detaining officer has a reasonable suspicion that the detained person might be armed and dangerous, the officer "may conduct a limited protective search for concealed weapons." (*Adams v. Williams* (1972) 407 U.S. 143, 146; see *Michigan v. Long* (1983) 463 U.S. 1032, 1050 (*Long*).) To undertake a search for weapons, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry*, *supra*, 392 U.S. at p. 27.) As with determining whether an officer had a reasonable suspicion to justify an investigatory detention, determining whether an officer acted reasonably in searching a detainee's vehicle for weapons, "due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (*Ibid.*)

If, while conducting a lawful detention, the officer observes incriminating evidence that is in plain view, the evidence may be admissible against the defendant, provided the officer did not violate the Fourth Amendment in arriving at the place from where the evidence could be plainly viewed and the incriminating character of the evidence is immediately apparent. (*Horton v. California* (1990) 496 U.S. 128, 136 (*Horton*).) If evidence lawfully observed in plain view, together with other facts and circumstances known to the officer, provides the officer with probable cause to believe that contraband or evidence of a crime will be found in a vehicle, the officer may search the vehicle and "every part of the vehicle and its contents that may conceal the object of the search." (*United States v. Ross* (1982) 456 U.S. 798, 825 (*Ross*); see *Ornelas, supra*, 517 U.S. at p. 696; *People v. Lee* (2019) 40 Cal.App.5th 853, 861–862.)

### 2. Analysis

We initially address defendant's argument that the trial court was required at the special hearing, and we are required on appeal, to defer to and accept the magistrate's finding that Officer Guevara's testimony regarding the spray paint cans is not credible. We disagree.

The magistrate appeared to have made his credibility finding based on Officer Guevara's testimony that he saw two spray paint cans in different areas of the car even though the police booked only one can into evidence. The apparent inconsistency, the magistrate concluded, rendered Officer Guevara's testimony regarding the paint cans "ridiculous."

The special hearing by the trial court on defendant's motion to suppress was conducted pursuant to section 1538.5, subdivision (i). Under that subdivision, the magistrate's findings

14

on the original motion are binding on the trial court "as to evidence . . . not affected by evidence presented at the special hearing." (*Ibid.*) As to such findings, the trial court defers to "the magistrate's power to judge credibility, resolve conflicts, weigh evidence and draw inferences, [and] . . . draws all presumptions in favor of the magistrate's factual determinations, express or implied, and upholds them if they are supported by substantial evidence." (*People v. Bishop* (1993) 14 Cal.App.4th 203, 214 (*Bishop*).)

If, however, a magistrate's findings *are* "affected by evidence presented at the special hearing" (§ 1538.5, subd. (i)), the trial court is not bound by such findings; the trial court reviews the findings de novo. (*Bishop*, *supra*, 14 Cal.App.4th at p. 210.) A magistrate's findings are "affected by evidence presented at the special hearing" (*id*. at p. 209) if the new evidence would probably have materially influenced the magistrate's finding in light of "the total evidence, new and old." (*Id*. at p. 212.)

In this case, the magistrate made his credibility findings without the benefit of viewing Officer Guevara's body worn video, which was played during the subsequent special hearing. The body worn video indisputably shows two spray paint cans in the locations Officer Guevara had identified: one on the back seat and one in the front passenger seat area. The body worn video corroborates Officer Guevara's testimony and undermines the magistrate's foundation for his credibility finding. Thus, the video evidence would probably have materially influenced the magistrate's credibility finding and, therefore, neither the trial court nor this court is bound by it. (§ 1538.5, subd. (i); *Bishop*, *supra*, 14 Cal.App.4th at p. 212.)

15

Turning to the merits, the People have the burden of proving the constitutional validity of defendant's detention by pointing to specific articulable facts, viewed in light of the totality of the circumstances, that provide an objective manifestation that defendant may be involved in a crime. (*Cortez*, *supra*, 449 U.S. at pp. 417–418; *Johnson*, *supra*, 38 Cal.4th at p. 723.) That burden is met here.

Officer Guevara is a police gang expert who monitors the White Fence gang. He is familiar with the territory claimed by White Fence and its rival, the Indiana Dukes. He is also aware that vandalism, as well as violent felonies, is a primary activity of the White Fence gang and that when a gang member ventures into a rival gang's territory to commit vandalism, he or she ordinarily does so with one or more armed accomplices nearby acting as lookouts.

Officer Guevara saw an individual cross Olympic Boulevard in an area claimed by the Indiana Dukes and write the word "White" on a wall with spray paint. Officer Guevara could reasonably infer from this act that the tagger was a White Fence gang member and, based on his experience and knowledge of how gang members commit such acts in a rival's territory, could reasonably expect to find the tagger's accomplice nearby. Officer Guevara looked in the direction from where the tagger had come and spotted defendant's car at the gas station. He drove to the gas station and immediately recognized defendant as a White Fence gang member. These facts, we conclude, are sufficient to support a reasonable suspicion that defendant was involved in the vandalism Officer Guevara had just witnessed. Officer Guevara could therefore temporarily detain defendant and conduct an investigation "to quickly dispel or confirm [his]

16

suspicions of criminal activity." (*Celis*, *supra*, 33 Cal.4th at p. 676.)

The fact that Guevara handcuffed defendant did not transform the detention into a de facto arrest. Because Officer Guevara, based on his training and experience, could reasonably infer that defendant might be armed, he was permitted to handcuff defendant during the brief detention. (See *Celis*, *supra*, 33 Cal.4th at p. 675; *People v. Glaser* (1995) 11 Cal.4th 354, 369.)[3]

After placing defendant in handcuffs, Officer Guevara used a flashlight to look through the front and rear windows of the driver's side of defendant's car. This action is permissible whether viewed as a lawful search for weapons incident to a detention (see *Long*, *supra*, 463 U.S. at pp. 1049–1052)[4] or as

---

[3] To the extent the trial court based its determination that defendant had been arrested on the fact that he was placed in handcuffs, we disagree. Reviewing the issue de novo, we conclude that defendant was detained, not arrested, while he was in handcuffs up until the point, after the discovery of the shotgun and spray paint can, that Officer Guevara informed him of his arrest.

[4] Because Officer Guevara was aware that gang members acting as lookouts for other gang members who are committing vandalism in the gang's rival's territory are typically armed and he could reasonably infer that defendant was acting as such a lookout, Officer Guevara could lawfully search the defendant's car for weapons. (See *Terry*, *supra*, 392 U.S. at p. 27.) The fact that defendant could not access a weapon inside the car at the time Officer Guevara was looking inside the car because defendant was handcuffed outside the car does not invalidate the search. If, at the conclusion of the investigatory detention,

17

conduct outside the purview of the Fourth Amendment (see *Texas v. Brown*, *supra*, 460 U.S. at pp. 739–740). As Officer Guevara looked into the rear seat area of the car, he saw a spray paint can in plain view, which is visible in his body worn video. In the context of an investigation relating to the criminal use of spray paint occurring immediately prior to the detention and the absence of any evidence suggesting a lawful purpose for the spray paint can, the incriminating nature of the spray paint can was immediately apparent. (See *Horton, supra,* 496 U.S. at p. 136.)

Based on the plain view sighting of the spray paint can in the back seat of defendant's car together with the other facts known to Officer Guevara discussed above, Officer Guevara arguably had probable cause to conduct a search of the interior of the car under the automobile exception to the Fourth Amendment's warrant requirement. (See *Ross*, *supra*, 456 U.S. at p. 825; *Ornelas*, *supra*, 517 U.S. at p. 696.) We need not decide whether Officer Guevara had probable cause for such a search at that point, however, because he did not enter the car or seize the spray paint can at that time. Instead, after checking defendant's identifying information through the police computer, he walked to the open door of the front passenger seat where, from his position outside the car, he saw another spray paint can in plain view—which can be seen in the body worn video—and the handgrip of a shotgun on the floorboard.

---

defendant was not placed under arrest, he would have been permitted to reenter his vehicle while the officers were present and access any weapons inside. The acts of looking through the windows and the open front door for weapons was therefore permissible. (See *Long*, *supra*, 463 U.S. at pp. 1051–1052.)

At this point, Officer Guevara, who was aware that defendant had been previously convicted of a felony and that his possession of the shotgun is therefore a felony (§ 29800, subd. (a)(1)), has probable cause to believe "that contraband or evidence of a crime will be found" in the car (*Ornelas*, *supra*, 517 U.S. at p. 696), and the authority to undertake a search of the car's interior (*Ross*, *supra*, 456 U.S. at p. 825). The subsequent seizures of the shotgun, the spray paint can in the front seat, the spray paint can in the back seat, and the ammunition found elsewhere in the car were thus permitted under the Fourth Amendment.[5]

On appeal, defendant points to Officer Guevara's agreement with defense counsel that he had "a hunch" about defendant to argue that "Officer Guevara only arrested [defendant] because he had a hunch that [defendant] was connected with the unidentified individual seen spray painting a nearby wall." The argument lacks merit.

During defense counsel's cross-examination of Officer Guevara during the special hearing, the following colloquy occurred:

"[Counsel:] You actually didn't see anywhere, where this person was coming from a vehicle, or you saw a general area he was coming from, right?

"[Officer Guevara:] That's correct.

---

[5] Because we conclude that the detention, searches, and seizures of defendant and the evidence defendant sought to suppress were lawful, we do not address the attenuation doctrine, on which the trial court relied.

19

"[Counsel:] Nothing to link anything that the tagger did to what Mr. Barclay was doing, except for your training and experience, correct?

"[Officer Guevara:] Correct.

"[Counsel:] You had a hunch?

"[Officer Guevara:] Yes."

Although defendant is correct that "officers are not entitled to rely on mere hunches" when conducting a traffic stop (*Hernandez, supra*, 45 Cal.4th at p. 299), the fact that Officer Guevara had a hunch that defendant was involved in the tagging Officer Guevara witnessed does not mean that he did not also have a reasonable suspicion that defendant was involved. In any event, Officer Guevara's characterization of his justification for the detention is not dispositive; the validity of the officer's actions under the Fourth Amendment "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time" (*Scott v. United States* (1978) 436 U.S. 128, 136), "not on the officer's actual state of mind at the time the challenged action was taken" (*Maryland v. Macon* (1985) 472 U.S. 463, 470–471). As explained above, the facts "provide some objective manifestation that the person detained may be involved in criminal activity" (*Souza, supra*, 9 Cal.4th at p. 231), and thus support the defendant's detention.

For all the foregoing reasons, we affirm the court's order.

## DISPOSITION

The order denying defendant's motion to suppress evidence is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.

21