# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, PENLAND, and COOPER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Staff Sergeant DAVID K. MYERS**
**United States Army, Appellant**

ARMY 20230100

Headquarters, U.S. Army Maneuver Center of Excellence
Trevor I. Barna, Military Judge
Colonel Javier E. Rivera, Staff Judge Advocate

For Appellant: Captain Stephen R. Millwood, JA (argued); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA; Captain Stephen R. Millwood, JA (on brief and reply brief).

For Appellee: Captain Stewart A. Miller, JA (argued); Colonel Christopher B. Burgess, JA; Major Justin L. Talley, JA; Lieutenant Colonel Jonathan P. Robell, JA (on brief).

16 December 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Senior Judge:

Appellant contends his convictions of three specifications of child endangerment of his own children, ages 2, 3, and 5, are legally and factually insufficient and the military judge erred by finding law enforcement's warrantless entry into appellant's home objectively reasonable under the emergency aid exception to the Fourth Amendment. As to both contentions, we disagree.[1]

---

[1] We have also given full and fair consideration to the matter personally raised by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982), and determine it merits neither discussion nor relief.

## BACKGROUND

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of three specifications of child endangerment in violation of Article 119b, Uniform Code of Military Justice, 10 U.S.C. § 919b [UCMJ]. The military judge sentenced appellant to a bad-conduct discharge, two-hundred and seventy days of confinement, and reduction to the grade of E-1.[2]

On 15 July 2022, military police (MPs), including Detective ▮ were dispatched to appellant's on-post home for a welfare check after an anonymous 911 caller claimed appellant's young children were left unattended. Upon arriving at the home, Detective ▮ was briefed by the on-scene MPs regarding their unsuccessful attempts to contact anyone within appellant's home. The MPs explained that their acts of ringing the doorbell and knocking on the door were met with no response.[3] After receipt of this MP briefing and seeing no vehicles in the driveway or lights on in the home, Detective ▮ called the anonymous caller's number, previously registered with the 911 dispatcher, to confirm the validity of the allegation that young children were unattended in appellant's home.

During this call, Detective ▮ testified the 911 caller was "assertive about the timeframe that [he and his wife] observed [appellant and his spouse] leave the residence without the children in tow. And they were pretty adamant that the children were at home unattended, and [provided] specific [details] about the items in the home, such as the doors, the condition of the home and the children definitely being inside of the residence."

At trial, the anonymous 911 caller, Sergeant First Class (SFC) ▮, now identified as appellant's next-door neighbor, testified to the events leading up to his and his wife's decision to call 911. Sergeant First Class ▮'s wife, ▮, testified to babysitting appellant's children in early May 2022. Upon arrival at the home, ▮ was instructed by appellant's wife, in the presence of appellant, to not leave the first floor of the home. Appellant and his wife then departed their home.

After their departure, ▮ could hear the children playing upstairs. ▮, a mother of young children, became concerned about the children's welfare.

---

[2] Appellant was sentenced to ninety days of confinement for each specification, to be served consecutively.

[3] The MPs noted the doorbell on appellant's home included a "ring" video camera. Accordingly, the MPs made repeated attempts to indicate their presence outside the home via the "ring" camera so any inhabitant of the home would receive notifications regarding their presence.

Eventually, she decided to ignore the instruction to not leave the first floor so she could check on the children's welfare.

Traveling upstairs, ██ found ██ locked in his room, with the doorknob's lock inverted and outside the room.[4] Inside the room, ██ saw broken thin glass ornaments on the floor and that ██'s diaper was filled with feces. No clean diapers were readily available. She next found the girls locked in their room, with the doorknob lock also inverted and outside the room. Like ██, the girls were "not kept up." ██ described being very concerned by: (1) the girls' inability to talk at all at the age of 3 (almost 4) and 5; (2) that it appeared normal for the three children to be locked in their rooms; and (3) the home's overall lack of cleanliness and the "pretty bad migraine [she received] from the smell and filth" within the home. ██ and SFC ██ testified ██ was stressed, distraught, and uneasy about the conditions in appellant's home and the welfare of his children.

Sergeant First Class ██ testified "it's okay to have different views of parenting and cleanliness and things like that. Everyone's different in this world . . . [but] we began to recognize that these kids were probably living in a pretty rough situation, and . . . it start[ed] to question our moral compass of what do we do." After ██'s evening of babysitting, she and SFC ██ observed the activities at appellant's home over the course of the late spring and early summer and particularly the two days prior to making the 911 call on 15 July 2022, when it appeared appellant and his wife had been leaving the children unattended on several occasions. SFC ██ testified he made the "huge decision" based on his moral compass, status of being a parent and a senior non-commissioned officer, and being "bound to do the right thing," to call 911 regarding appellant and his wife leaving their young children unattended.

After receiving the initial 911 call, talking with the MPs on scene, and then calling and speaking with SFC ██, Detective PT circled appellant's home, banging on doors and walls to elicit a response from within. After a few minutes, Detective ██ saw a male toddler, approximately two years of age, emerge in the rear upstairs window of the home. As it was now dark outside, Detective ██ used his flashlight to see more clearly. The boy was completely naked and dirty and the window appeared smeared with feces or dirt.

With the appearance of an apparently unattended young child, Detective ██ became very concerned and decided to call emergency services to gain entry into appellant's home. Detective ██ testified he was concerned about the whereabouts

---

[4] A housing inspector from the on-post's Directorate of Public Works testified the doorknobs were not inverted in any room when he inspected appellant's home in July of 2021, just prior to appellant's move-in date, as inverted doors are a safety hazard the inspector was required to annotate.

and well-being of the other two young children, as the presence of the young boy further corroborated the 911 caller's allegations. About this time, however, appellant pulled into his driveway.

Detective ■ advised appellant it was against post regulation to leave young children unattended in the home and that Detective ■ wanted to immediately enter the home to aid the children and ensure their well-being. In response, appellant unlocked his front door and entered the home. Detective ■ and MP Sergeant (SGT) ■ followed appellant from behind.

Appellant immediately led Detective ■ up the stairs to the second level of the home and unlocked the door to the room of his son, ■ The doorknob to ■'s room was inverted, as it had been when ■ babysat in early May 2022, so the locking mechanism faced away from the room's interior and was unreachable by ■ Once appellant unlocked the door, ■ emerged from the room naked and covered in feces. Detective ■ described ■'s room:

> ". . . completely trashed with more feces, dirt; again, no sheets and a blanket. The furniture was turned around backwards up against the windows. All the toys in the room were – it appeared [■] may have smeared feces all on the toys, on the bed, on the walls, empty wrappers of granola bars and some other food products all over the place."

Next, appellant led Detective ■ and SGT ■ to the room of his young daughters, ■ and ■, which was further down the upstairs hallway. This hallway contained more feces. The lock on ■ and ■'s door was inverted, like ■'s door and the same as when ■ had babysat in May 2022, trapping the young girls inside. When appellant opened the door, Detective ■ observed the girls wearing diapers heavy with feces and urine. Describing the condition of the girls' room, Detective ■ testified, "they had . . . a kitchen set that you would give a little kid [that was] covered in feces as well; dirt and trash throughout the room; and again, the food wrappers, the granola bar wrappers excessive all throughout the room." Detective ■ also noted ■ and ■ appeared to be emaciated and both were non-verbal, only communicating in grunts.

Detective ■ called appellant's First Sergeant (1SG), ■, and instructed him to immediately come to appellant's home to see its condition. First Sergeant ■ testified at trial to his observations of the children's rooms as follows: (1) the doorknobs were inverted and facing the hallway; (2) "copious amounts of" feces were smeared all over the children's room walls, beds, and toys; (3) the dressers

were turned and facing the walls as a "safety measure so they could not open the drawers;" and (4) a very strong smell of urine and feces emanated from the rooms.[5]

Military Police Sergeant ███ testified, corroborating Detective ███ and 1SG ███'s observations, regarding the utter filth and chaos of the children's bedrooms. Additionally, the government admitted photographs taken by SGT ███ depicting the children's bedrooms covered in feces and other unsanitary contaminants on 15 July.

After being released from their rooms, all three children were brought downstairs where they were examined by Emergency Medical Services and, subsequently, transported to the hospital for further examination. Later that evening, appellant called Staff Sergeant (SSG) ███, a fellow drill sergeant. Appellant said to SSG ███ "I f***** up. I can't tell you exactly what happened right now, but I need you to tell me you can watch my kids."

Ultimately, SSG ███'s wife, ███, picked appellant's children up from the hospital. ███ observed the children's hair to be matted and their "hands and faces [to be] brown" as if covered in feces. While later bathing the children, ███ noted ███ was covered in feces, had a hair tie stuck in her matted hair, and had clumps of head lice on her reddened scalp. ███ had a hair tie stuck in her hair, head lice on her scalp, and open sores on her buttocks. While ███ did not observe head lice on ███ ███ noticed his penis and buttocks were extremely red. Regarding the timeline it took to create the children's unhygienic, unkempt, and infested physical state, ███ testified, "that doesn't just happen."

███, a military spouse from appellant's unit and a former emergency room nurse with a forensic nursing degree, testified she observed headlice on all three children the next day when she visited SSG ███'s home. ███ testified the children never spoke, instead communicating with gestures and grunting.

Doctor ███, a government expert, testified the children's living conditions constituted trauma and likely contributed to developmental delays. Doctor ███, another government expert, testified the pervasive head lice identified on the girls' scalps was indicative of a long-term presence of lice.

---

[5] First Sergeant ███ also testified there was a "clear difference" between the children's rooms and appellant's master bedroom. The master bedroom was also located on the second floor and was connected to the children's rooms by a hallway containing a pile of old dirty diapers with "what looked like mold coming out of them." The master bedroom did not have any remnants of urine or feces, the dressers were turned the right way, and the doorknob locking mechanism faced into the room.

## LAW AND DISCUSSION

*Legal and Factual Sufficiency*

In accordance with the newly amended Article 66, UCMJ, this court "may consider whether the finding[s] [are] correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof." Article 66(d)(1)(B), [UCMJ]. Once appellant shows a factual deficiency, this court may evaluate the evidence while giving ". . . (1) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and (2) appropriate deference to findings of fact entered into the record by the military judge." *Id.* If clearly convinced the finding of guilty was not supported by the evidence, ". . . the [c]ourt may dismiss, set aside, or modify the finding, or affirm a lesser finding." *Id.* The Court of Appeals for the Armed Forces [CAAF] notes the level of deference afforded to the trial court ". . . will depend on the nature of the evidence at issue." *United States v. Harvey*, __M.J.__ (C.A.A.F. 6 Sep. 2024). "For example, a [Court of Criminal Appeals] might determine that the appropriate deference required for a court-martial's assessment of testimony of a fact witness, whose credibility was at issue, is high because the CCA judges could not see the witness testify." *Id.*

As a general matter, direct evidence is not required to prove guilt beyond a reasonable doubt. Rule for Courts-Martial [R.C.M.] 918(c). Instead, "[c]ircumstantial evidence standing alone or together with other evidence, can prove a fact necessary to establish an element of an offense beyond a reasonable doubt." *United States v. Koth*, 2017 CCA LEXIS 145, at *3-4 (Army Ct. Crim. App. 2017) (citations omitted). *See also* R.C.M. 918(c).

Child endangerment consists of three elements:

> 1) the accused had a duty for the care of a certain child;

> 2) the child was under the age of 16;

> 3) the accused endangered the child's mental or physical health, safety, or welfare through design or culpable negligence.

*Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, ¶ 59*b*.

"Child endangerment, like other offenses by culpable negligence, is a general-intent offense reviewed under an objective test." *Koth*, 2017 CCA LEXIS 145, at *4. (citing *United States v. Gibson,* 43 M.J. 343, 346 (C.A.A.F. 1995)). Accordingly, a fact-finder can properly find guilt where ". . . appellant's negligent omission was accompanied by a *culpable* disregard for the foreseeable consequences . . ." *Id.* at 4-5. *See also United States v. Stradtmann*, 84 M.J. 378 (C.A.A.F. 2024). "Actual

6

physical or mental harm to the child is not required." *Koth*, 2017 CCA LEXIS at 7 (see also *MCM*, pt. IV, ¶ 59c.(3)).

Appellant contends the military judge's findings of guilty were legally and factually insufficient for two reasons. First, appellant contends the government failed to establish beyond a reasonable doubt that he committed the charged actus reus and, even assuming he did, the alleged actus reus did not endanger his children. We disagree with appellant's assertions.

We first turn to analyze the actus reus alleged in each of the three specifications (one specification per child). The government charged appellant with child endangerment by culpable negligence "by locking [each said child in a room] with no adult present in the home while exposed to animal and human feces and other unsanitary conditions" "on divers occasions between on or about 5 May 2022 and on or about 15 July 2022." Appellant asserts the government failed to prove beyond a reasonable doubt the language "locking" and "no adult [being] present in the home." Appellant was on notice to defend against this language; he heavily contested the language at trial and continues now on appeal. We first discuss below the language of "no adult [being] present in the home."

As to this language, we find appellant has failed to make a specific showing of a deficiency in proof as required by *Harvey*. In his brief, appellant concedes it was "indisputable that the children were exposed to feces and left unsupervised for some period of time on 15 July 2022."

On that day, appellant's neighbors, SFC █ and █, testified to seeing appellant and his wife's vehicles leaving the home with no children inside. SFC █ and █ noted that no other vehicle arrived or parked at appellant's home after the vehicles departed. Sergeant First Class █ called the MPs, and the MPs arrived "about 30 minutes or so" later. After the MPs and Detective █ attempted to get a response from anyone inside the home for approximately 15 minutes, appellant pulled into his driveway. As soon as appellant unlocked his front door and walked inside, Detective █ and the MPs confirmed that "no adult [was] present" in the home.

As to "no adult [being] present" on another day between 5 May and 14 July 2022, 1SG █ testified in-depth regarding appellant's military work schedule. The government admitted four exhibits clearly documenting appellant's military work schedule during May, June, and July 2022. First Sergeant █ also testified appellant devoted "a lot of time going to the VFW [Veterans of Foreign Wars]" during his off-duty hours and seeing appellant and his wife (but not the children) at an event at the VFW in late June or early July 2022.

7

Sometime in March 2022, SSG ▉ testified appellant said he had "a job at the VFW." Appellant also told SSG ▉ that appellant was "[m]ore often than not" working at the VFW when he was off duty from his military work schedule. Staff Sergeant ▉ also saw appellant and his wife (again without the children) at the VFW for a July 4th celebration.

In approximately May 2022, appellant's wife started working at the VFW, the exact location appellant "devoted" hours of his time while off duty from his military work schedule. The government admitted appellant's wife's VFW time cards from mid-June through 15 July 2022. There are several instances where appellant's military work schedule and his wife's VFW work schedule overlapped. Both parents were at work.

After appellant's wife started her VFW job, ▉ testified appellant and his wife's vehicles were both not at the home "[a]ll days of the week." ▉ never observed the children getting into either vehicle. Appellant's vehicle usually departed the home first, but not always. ▉ testified when appellant and his wife "were first gone a lot, there was another vehicle" that would be at appellant's home but after two to three weeks "it stopped coming." ▉ estimated she stopped seeing the other vehicle at appellant's home sometime in early June 2022. On 13 and 14 July 2022, in particular, ▉ and SFC ▉ testified to watching appellant's home closely and noticing appellant's and his wife's vehicles had both departed and no other vehicle was at the home. On 13 July 2022, appellant had military duty and his wife was working at the VFW.

Given the direct evidence that "no adult [was] present" in the home on 15 July 2022 and the circumstantial evidence as to "no adult [being] present" on another occasion between on or about 5 May to 14 July 2022, presented in the form of multiple government witnesses and exhibits, appellant has not met his burden of demonstrating a specific showing of a deficiency in proof as to this language.[6]

Having found no deficiency in proof as to this language, we now turn to the word "locking," and whether it is required to sustain appellant's conviction. We determine in this case it is not.

Our sister court determined that leaving a young child exposed amid unsanitary conditions, such as feces and urine, open trash bags, and dirty diapers

---

[6] For these same reasons, we find appellant's conviction to the language "no adult present" was also legally sufficient. During our factual sufficiency review we considered, as required, all the evidence in the record. Our determination that appellant failed to establish a specific showing of deficiency in the proof forestalls any further analysis by us as to the issue of factual sufficiency.

constitutes culpable negligence and exposure to these hazards can create a "reasonable probability" a child will be harmed. *United States v. Lafontaine*, 2017 CCA LEXIS 523, at *9-10 (A.F. Ct. Crim. App. 2017) (citing *United States v. Plant*, 74 M.J. 297, 300 (C.A.A.F. 2015)). In *Lafontaine*, appellant left her infant son exposed to soiled diapers and food waste in places in the home he could access and "[s]he admitted she did not have visual contact with him all of the time." *Id.* at *8. He was also left in soiled diapers for hours at a time. *Id.* It was immaterial whether she was present in the home, or not, as her son's exposure to hazardous conditions, out of his mother's eyesight, was sufficient to constitute child endangerment.

Likewise, in this case, it is immaterial whether the children were, or were not, locked in their rooms. "[N]o adult [was] present in the home" and each young child was exposed to "copious amounts of feces" and "other unsanitary conditions" within their rooms. When discovered on 15 July 2022, DM was covered in feces and his two sisters, ELM and CEM, were wearing diapers heavy with feces and urine.

Multiple witnesses testified to the voluminous amount of feces and the "other unsanitary conditions" of the children's rooms. The government also admitted pictures depicting the feces and "other unsanitary conditions" in the children's rooms which serve to establish a *res ipsa loquitur* as to the hazardous conditions existing in their rooms on diverse occasions well before the children were discovered by law enforcement on 15 July 2022.[7]

We determine the word "locking" is not necessary to establish beyond a reasonable doubt that appellant committed the offense of child endangerment regarding his three children. Even if the word was deleted, it would not serve to broaden appellant's scope of liability, as the government established beyond a reasonable doubt that appellant committed the specific language of "no adult [being] present in the home."[8]

---

[7] *Res ipsa loquitur* is a Latin phrase meaning "the thing speaks for itself." *Res ipsa loquitur*, Black's Law Dictionary (9th ed. 2009). In English, the phrase constitutes ". . . [t]he doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case. . . ." *Id.*

[8] We distinguish this case from *United States v. English*, 79 M.J. 116 (C.A.A.F. 2019) (holding an appellate court's deletion of the language "to wit, grabbing her head with his hands" and inserting the language "unlawful force" was an impermissible broadening of appellant's offense and offended due process). In *English*, our superior court recognized "[w]here the CCA narrows the charging language rather than broadening it, such a change does not run afoul of . . . due

(continued . . .)

Additionally, appellant has not met his burden to establish that a specific deficiency in proof as to the word "locking" exists as discussed below.

On 15 July 2022, Detective ██ and SGT ██, testified all three children were locked in their rooms. As to appellant's culpability, upon entering his home, appellant knew the exact location of his three young children as demonstrated by appellant immediately walking upstairs to unlock the children from their bedrooms. Appellant expressed no surprise at finding his children locked in their rooms in utter filth nor at their unkept and unsanitary conditions. After the children were discovered locked in their rooms, appellant called a fellow drill sergeant, SSG ██, to request he watch the children. During the call, appellant stated "I f***** up." Appellant made no reference to his "wife," or "we," instead using only the word "I" to describe the situation to a fellow soldier.

On 15 July 2022, the locks to the children's rooms were inverted, however, the lock to the master bedroom door was not inverted. An on-post housing inspector testified none of the home's rooms had inverted locks when he inspected appellant's home just prior to appellant's move-in the previous summer. Accordingly, it stands to reason between the summer of 2021 and early May 2022, the children's doorknobs had been changed.

In early May 2022, appellant's wife, in appellant's presence, told ██ not to go upstairs where the children were located while ██ was in appellant's home to babysit the children. ██ later found all three children locked in their rooms with their doorknobs inverted and testified the children were "not kept up." ██ further testified ". . . it seemed just from observations that it was normal for them to be in their rooms by themselves."

On 15 July 2022, law enforcement emphasized the children's rooms were "completely trashed" and littered with feces. Detective ██ also noted the furniture in ██'s room was all turned backwards so the drawers were facing the walls.

---

(. . . continued)
process concerns." *Id.* at 122, n.5. In the case before us, appellant was on notice to defend against the charged language, which he zealously did at trial and now on appeal. Even if we deleted "locking" from the specification that would only serve to narrow the language, as opposed to broaden, of what "appellant was convicted of, at trial" in accordance with *English*. *Id.* at 122.

Given the facts as outlined above and giving appropriate deference to the trial court, we do not find appellant has demonstrated a specific deficiency in proof as to the word "locking."[9]

*Judicial Error in Applying the Emergency Aid Exception*

A military judge's ruling on a motion to suppress evidence is reviewed for an abuse of discretion. *United States v. Shields,* 83 M.J. 226, 230-31 (C.A.A.F. 2023)(citations omitted). In conducting this review, the corresponding evidence is considered in the light most favorable to the party prevailing at trial. *Id.* An abuse of discretion occurs when:

(1) The military judge predicated a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Lattin,* 83 M.J. 192, 198 (C.A.A.F. 2023) (citations omitted).

Warrantless searches are presumptively unreasonable unless they fall into one of several specific exceptions to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357 (1967). One such exception is when officers enter ". . . a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006) (citations omitted). This exception has been generally coined as the "emergency aid" exception. *Id.*

Among other circumstances, the emergency aid exception applies to situations where law enforcement has an "'. . . objectively reasonable basis for believing' . . . that a 'person within the house is in need of immediate aid.'" *Michigan v. Fisher,* 558 U.S. 45, 47 (2006) (citations omitted). Put another way, ". . . warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393-94.

"An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Brigham City,* 547 U.S. at 404. (Citing *Scott v. United States,*

---

[9] Accordingly, we also find appellant's conviction to the language "locking" was legally sufficient.

436 U.S. 128, 138 (1978)). "The officer's subjective motivation is irrelevant." *Id.* (citation omitted).

Here, the military police attempted for fifteen minutes to make contact with anyone within appellant's home after receiving a 911 call reporting unattended young children existed in the home. After unsuccessful attempts to receive a response from anyone within appellant's home, Detective ▮ called the 911 caller to confirm the validity of the initial report. During that call, Detective ▮ received specific details from the 911 caller, appellant's next door neighbor, substantiating the validity of the report. Detective ▮ and the MPs, however, still did not enter appellant's home.

It was not until Detective ▮ and the MPs observed a two-year-old boy appear alone, naked, and apparently covered in feces or dirt in a second floor window of appellant's home that the situation became an emergency. The spotting of this young boy further corroborated the underlying 911 report that three young children, aged two, three, and five, were unattended in the home. Despite previous repeated efforts, Detective ▮ and the MPs had been unable to visually observe or make contact with the other two young children to provide immediate aid and confirm their safety and wellbeing. Given the information Detective ▮ knew at the time, Detective ▮'s insistence that appellant let Detective ▮ into appellant's home immediately to aid his young children and verify their safety and wellbeing, absent a search warrant, was objectively reasonable.[10]

## CONCLUSION

The findings of guilty and sentence are AFFIRMED.

Judge COOPER concurs.

PENLAND, Judge, concurring in part and in the result;

I join my colleagues' treatment of the military judge's search ruling, for his decision was well within the bounds of reasonable judicial discretion. I also concur with their decree, though taking a slightly different path.

In *United States v. Harvey*, __M.J.__ (C.A.A.F. 6 Sep. 2024), our superior court explained an appellant must meet two "trigger" conditions, before we may review for factual sufficiency: assertion of error; and, a showing of deficiency in

---

[10] Detective ▮ testified that had appellant not pulled into his driveway at the exact time he did, Detective ▮ was in the process of calling emergency services to gain entrance to the home to immediately aid and ensure the safety of the young children inside.

proof. If they fail either, our factual sufficiency review ends. My colleagues hold that appellant has failed the second trigger condition. They also divide the *actus reus* into two components, and they determine that "locking" is not necessary to prove appellant's guilt; this is our point of departure. I would not (and for purposes of this concurrence do not) organize the actus reus in that way, for it is not necessary. Appellant has not shown a deficiency of proof – in whole or in any part. I would summarily affirm.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court